UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**MAURICE A. ALEXANDER**
2125 4th Street, Apartment 205, Northwest
Washington, DC 20001

                    *Plaintiff,*

            v.                                          Case No.: _____

**EDGEWOOD MANAGEMENT**
**CORPORATION**                                         **JURY TRIAL DEMANDED**
20316 Seneca Meadows Parkway
Germantown, MD 20876

**COMMUNITY PRESERVATION AND**
**DEVELOPMENT CORPORATION**
8403 Colesville Road, Suite 1150
Silver Spring, MD 20910

**EDGEWOOD SENIORS: THE VIEW**
635 Edgewood Street, Northeast
Washington, DC 20017

**THE OVERLOOK AT OXON RUN**
3700 9th Street, Southeast
Washington, DC 20032

**A&R DEVELOPMENT CORPORATION**
1040 Park Avenue, Suite 300
Baltimore, MD 21201

**CAPITOL GATEWAY SENIOR**
201 58th Street, Northeast
Washington, DC 20019

                    *Defendants.*

## COMPLAINT

This is a civil rights action in which Plaintiff Maurice A. Alexander seeks to remedy

violations of his right to equal opportunity in housing, as secured by Title VIII of the Civil

Rights Act of 1968 (Fair Housing Act), 42 U.S.C. §§ 3601 *et seq.* and the District of Columbia

Human Rights Act, D.C. Code §§ 2-1401 *et seq*. As alleged below, Mr. Alexander's right to fair housing was violated by the three rental properties defendants—Edgewood Seniors: The View ("The View"), The Overlook at Oxon Run ("The Overlook") and Capitol Gateway Senior ("Capitol Gateway")—and their owners and managers, defendants Edgewood Management Corporation ("Edgewood"), Community Preservation and Development Corporation ("CPDC"), and A&R Development Corporation ("A&R") (collectively, "Defendants"). Mr. Alexander also seeks relief as a third-party beneficiary from Defendants' breaches of contractual commitments made to the District of Columbia Housing Authority ("DCHA"). As a result of Defendants' statutory violations and contractual breaches, Mr. Alexander suffered substantial injury, including, *inter alia*, denial of housing, prolonged homelessness, separation from his minor son, physical suffering, and emotional distress.

Plaintiff further alleges, upon personal knowledge as to his own conduct, and upon information and belief with respect to other matters, as follows:

### PRELIMINARY STATEMENT

1. This lawsuit seeks to remedy and put an end to Defendants' improper and discriminatory tenant selection policies and practices. Notwithstanding that Mr. Alexander was qualified in all respects to rent publicly-assisted ("assisted housing") from Defendants, as evidenced by the fact that the DCHA referred him to Defendants for that purpose, Defendants denied Mr. Alexander's applications to rent units in three assisted housing developments. In so doing, Defendants relied on a seven year-old misdemeanor conviction of Mr. Alexander that did not involve violent or drug-related conduct, which was not a legitimate or lawful ground for denying the applications. Defendants' conduct caused direct and substantial injury to Mr. Alexander, forcing him to endure months of homelessness, physical suffering, and emotional distress.

2.      Governing federal law limits the criminal background information that can be considered in acting on applications for assisted housing to certain convictions involving violent or drug-related conduct.  In contrast, Defendants' respective policies and practices, as adopted and applied to Mr. Alexander, are unnecessarily punitive, and discriminatory in their use of prior criminal convictions to deny access to publicly assisted housing.  Defendants have failed to establish reasonable limits on the time period and/or the nature of prior convictions they consider in evaluating rental applications, and they have instead rejected applicants such as Mr. Alexander without regard to whether a prior conviction raises a legitimate concern that an applicant's rental would "adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents."  As such, Defendants' policies and practices for selecting tenants are contrary to federal law and produce artificial and arbitrary barriers to assisted housing.  Moreover, in denying Mr. Alexander's rental applications, Defendants failed to comply even with their own unnecessarily punitive tenant selection policies.

3.      Defendants' policies and practices have a disparate and discriminatory impact on qualified African-American applicants for assisted housing.  In Washington, D.C. and elsewhere, a disproportionate number of persons who have criminal convictions are African-American.  Accordingly, Defendants' tenant selection policies and practices have a disparate impact on African-American applicants for assisted housing by excluding them from subsidized housing at higher rates than white applicants, without a legitimate or lawful basis.  To the extent Defendants have a legitimate need to consider prior criminal background in evaluating rental applications, there exist less discriminatory policies and practices than those used by Defendants, including those permitted by federal law that would satisfy Defendants' needs.  Additionally, D.C. laws governing the DCHA's public housing and Housing Choice Voucher Program applicant

eligibility criteria track the same less discriminatory federal law guidelines and thus offer a similarly less discriminatory alternative.

4.     This lawsuit seeks money damages and prospective relief for Mr. Alexander, who was denied housing because of the Defendants' discriminatory and unnecessarily punitive policies and practices.  It further seeks prospective affirmative relief requiring Defendants to implement policies and practices to ensure compliance with federal and D.C. antidiscrimination laws and to provide equal housing opportunities to prospective assisted housing applicants.

5.     This lawsuit also seeks to secure for Mr. Alexander the full benefits conferred on assisted housing applicants by contracts entered into between the DCHA and Defendants (and/or their representatives or agents) and to remedy Defendants' breaches of their contractual obligations.  Mr. Alexander and similarly situated applicants for assisted housing are intended third-party beneficiaries of those contracts and, accordingly, have standing to seek relief from breaches of contract provisions that require Defendants to maintain policies and practices consistent with federal law.

## PARTIES

6.     **Plaintiff Maurice A. Alexander** is an African-American resident of the District of Columbia.  He has lived in the District since 1948 and attended elementary school, high school, and college (Federal City College, now the University of the District of Columbia) in the District.  Mr. Alexander currently resides at LeDroit Apartments, a DCHA property, located at 2125 4th Street, Apartment 205, Northwest, Washington, DC 20001.

7.     Since approximately 1998, Mr. Alexander has dedicated himself to working for the District of Columbia chapter of CURE, an organization committed to advocating for changes in the criminal justice system (http://www.curenational.org/index.php).   In addition, Mr.

Alexander obtained a paralegal certificate from the George Washington University and received a Nursing Assistant Certificate in 2005, as well as a home health aide certification in 2008 which has allowed Mr. Alexander to care for aging family members.

8.      In 2007, Mr. Alexander was convicted of a misdemeanor of attempted threats, for which he served a ten day jail sentence.  The conduct underlying this 2007 conviction was Mr. Alexander's admonition to a District police officer that he should not abuse an African-American person whom the officer had detained.  Mr. Alexander was a bystander who did not know the individual who was being detained, and his conduct did not involve any violent conduct or physical contact with the officer.

9.      **Defendant Edgewood Management Corporation** is located at 20316 Seneca Meadows Parkway, Germantown, MD 20876 and provides property management services to residential properties, including properties in the District of Columbia.  Defendant Edgewood has been involved in the management of over 18,000 federally assisted apartments.

10.     **Defendant Community Preservation and Development Corporation** is located at 8403 Colesville Road, Suite 1150, Silver Spring, MD 20910 and operates residential rental properties, including those in the District of Columbia.

11.     Upon information and belief, from at least March 13, 2014, and at all times relevant to this Complaint, Defendants Edgewood and CPDC managed and operated the residential rental property known as **Edgewood Seniors: The View**, located at 635 Edgewood Street, Northeast, Washington, DC 20017.  Upon information and belief, **Defendant The View** operates in part as a government subsidized housing provider for low-income seniors and disabled persons.

12.     Upon information and belief, from at least May 14, 2014, and at all times relevant to this Complaint, Defendants Edgewood and CPDC managed and operated the residential rental property known as **The Overlook at Oxon Run,** located at 3700 9th Street, Southeast, Washington, DC 20032.  Upon information and belief, **Defendant The Overlook** operates in part as a government subsidized housing provider for low-income seniors and disabled persons.

13.     **Defendant A&R Development Corporation** is located at 1040 Park Avenue, Suite 300, Baltimore, MD 21201 and owns, develops, and invests in residential properties, including properties in the District of Columbia.

14.     Upon information and belief, from at least April 1, 2014, and at all times relevant to this Complaint, Defendant A&R managed the residential rental property known as **Capitol Gateway Senior**, located at 201 58th Street, Northeast, Washington, DC 20019, part of the Capitol Gateway Family.  Upon information and belief, **Defendant Capitol Gateway** operates in part as a government subsidized housing provider for low-income seniors and disabled persons.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 as Plaintiff's federal claim arose under the Constitution, laws, or treaties of the United States, and under 42 U.S.C. § 3613.  This court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's D.C. law claims, which are so related to Plaintiff's federal claim that they form part of the same case or controversy.

16.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 1391(b)(2) because Defendants' unlawful rental practices were committed in Washington, D.C., and Plaintiff—who resides in this judicial district—was denied housing at Defendants' Washington, D.C. properties.

<u>FACTUAL BACKGROUND AND STATEMENT OF THE CLAIM</u>

17.    Defendants Edgewood, CPDC and A&R manage and operate residential rental properties in the District of Columbia.   Those properties include properties that provide subsidized housing, including Defendants The View, Capitol Gateway, and The Overlook ("Rental Property Defendants").  As assisted housing providers, the Rental Property Defendants have contractual agreements with the DCHA governing, *inter alia*, the selection of prospective tenants.  In addition, the DCHA reviews applications for subsidized housing and refers eligible applicants to subsidized housing providers, including the Rental Property Defendants.   The DCHA referred Mr. Alexander to each of the Rental Property Defendants.

18.    Upon information and belief, The View, Capitol Gateway, and The Overlook have represented and agreed through contractual agreements with the DCHA that each property complies and will comply with all federal laws when evaluating applications for assisted housing.  Upon information and belief, The View, Capitol Gateway, and The Overlook have further represented to the DCHA and agreed that the Rental Property Defendants have established and will adhere to reasonable and non-discriminatory tenant selection policies and practices.

19.    Mr. Alexander submitted housing applications to The View, Capitol Gateway and The Overlook, in turn, in March, April, and May 2014, respectively.  Each of the Rental Property Defendants denied Mr. Alexander's application based on a seven-year old misdemeanor offense. This is not a permissible reason for denying Mr. Alexander's application and is contrary to federal law and even the Rental Property Defendants' own written policies.

20.    On account of his repeated denials of housing, Mr. Alexander sought counsel at the Legal Aid Society of the District of Columbia.  Counsel assisted Mr. Alexander in appealing the denials through letters sent to each of the Rental Property Defendants.

A.     **The View**

21.     Upon information and belief, in early 2014, the DCHA referred Mr. Alexander to The View.

22.     Mr. Alexander submitted an application for housing to The View on March 13, 2014. On March 26, Mr. Alexander received a letter from The View, dated March 18, informing him that his application had been denied ("The View denial letter").

23.     The View denial letter provided the following reasons for denying Mr. Alexander's application:  1) "Criminal history unsatisfactory" and 2) "Fraud alert."  The letter did not elaborate on these reasons, other than to state that the decision was based on "credit and/or public record information."  The View denial letter provided Mr. Alexander with 14 days to respond if he disagreed with the decision.

24.     Mr. Alexander appealed The View's denial and, on April 1, sent The View a letter questioning the denial of his application.  In addition, Mr. Alexander requested that The View contact him via email and physical mail due to his "dire living situation."

25.     The View failed to respond to Mr. Alexander's April 1, 2014, letter.

26.     On June 19, 2014, Mr. Alexander's counsel sent a follow-up appeal letter to The View seeking reconsideration of the denial and clarifying why the bases for Mr. Alexander's denial were invalid.  In addition to the concerns about the improper exclusion of Mr. Alexander because of his criminal conviction, the letter specifically noted that with regard to the "fraud alert," Mr. Alexander had been the victim and not the perpetrator of identity theft and fraud.

27.     The View failed to respond to Counsel's June 19, 2014, letter or to provide any further explanation for its actions.

**B.     Capitol Gateway**

28.     On April 1, 2014, the DCHA deemed Mr. Alexander eligible for "Project-Based Housing Assistance" and referred him to Capitol Gateway.   Mr. Alexander submitted an application for housing to Capitol Gateway on April 14 and, on April 20, received a letter from Capitol Gateway (dated April 17) informing him that his application had been denied ("Capitol Gateway denial letter").

29.     The Capitol Gateway denial letter provided the following factor as the basis for the denial:   "Criminal – Misdemeanor Conviction(s) or Pending Case."   The letter did not provide any elaboration on this factor, nor did it provide a time frame for Mr. Alexander to respond to the decision.

30.     Mr. Alexander sent Capitol Gateway a letter requesting a hearing to appeal the denial of his application.  Capitol Gateway failed to respond to Mr. Alexander's letter.

31.     On June 30, 2014, Mr. Alexander's counsel sent a follow-up appeal letter to Capitol Gateway seeking reconsideration of the denial and clarifying why the basis for Mr. Alexander's denial was invalid.

32.     Capitol Gateway failed to respond to Counsel's June 30, 2014, letter or to provide any further explanation for its actions.

**C.     The Overlook**

33.     On May 14, 2014, the DCHA deemed Mr. Alexander eligible for "Project-Based Housing Assistance" and referred him to The Overlook.  Mr. Alexander submitted an application for housing and received a letter from The Overlook dated May 19 informing him that his application had been denied ("The Overlook denial letter").

34.     The Overlook's denial letter provided the following reasons for denying Mr. Alexander's application:   1) "Rent-to-income ratio unsatisfactory" and 2) "Criminal history unsatisfactory."   But the letter did not elaborate on these reasons, other than to state that the decision was based on "credit and/or public record information."   The Overlook denial letter also provided Mr. Alexander with 14 days to respond if he disagreed with the decision.

35.     In a letter dated May 28, The Overlook agreed to meet with Mr. Alexander regarding his application and scheduled a meeting for June 6.   The May 28 letter requested that Mr. Alexander contact the leasing office in the event of a scheduling conflict.   When Mr. Alexander attempted to reschedule the meeting, however, The Overlook refused to provide him with a new date.

36.     On June 30, 2014, Mr. Alexander's counsel sent a follow-up appeal letter to The Overlook seeking reconsideration of the denial and clarifying why the bases for Mr. Alexander's denial were invalid.   In addition to concerns about the improper exclusion of Mr. Alexander because of his criminal conviction, as alleged further below, the letter specifically noted that with regard to the unsatisfactory "Rent-to-income" factor, Mr. Alexander's rent-to-income ratio was irrelevant given that rent should be calculated at approximately 30 percent of his monthly income.

37.     The Overlook failed to respond to Counsel's June 30, 2014, letter or to provide any further explanation for its actions.

**D.     Defendants' Unlawful Policies And Practices**

38.     Federal law permits the U.S. Department of Housing and Urban Development (HUD) to enter into contracts with public housing agencies, which in turn may "enter into contracts to make assistance payments to owners of existing dwelling units" under certain low-

income housing assistance programs. 42 U.S.C. § 1437f(b)(1). Further, dwelling units qualifying as "assisted" housing are to be designated for "low-income families," which include elderly individuals, and a low-income family's rent shall be calculated under a specific formula requiring the family to pay approximately 30 percent of its monthly adjusted income, or the higher of two other less common income or welfare-related amounts. 42 U.S.C. §§ 1437a(a)(1) & 1437f(c)(3) (applying a similar payment standard to contracts between public housing agencies and owners offering low-income housing assistance); *see also* 42 U.S.C. § 1437a(b)(3).

39. As owners of federally assisted housing, the Rental Property Defendants were required to comply with the procedures and requirements established under 42 U.S.C. §§ 13601 *et seq.*, as a condition of receiving housing assistance for such housing. 42 U.S.C. § 13601. Further, a low-income housing assistance provider falls under the definition of a "federally assisted housing" provider (as prescribed by federal law). *See* 42 U.S.C. §§ 13641(2)(B) & 1437f(b)(1).

40. Federal law authorizes public and assisted housing providers to evaluate an applicant's suitability for subsidized housing based on drug-related and violent crimes in the applicant's criminal background. Specifically, federal law authorizes the exclusion of applicants who "engaged in any drug-related or violent criminal activity or other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or public housing agency employees" during a "reasonable time preceding the date when the applicant . . . would otherwise be selected for admission." 42 U.S.C. § 13661(c); *see also* 24 C.F.R. § 5.855(a). Mr. Alexander's seven-year old (at the time) misdemeanor offense does not fall into any of these categories. It was not drug-related or violent, nor was it an incident of the type which would likely be repeated. Federal law does not

authorize public or assisted housing providers to exclude applicants—who are otherwise eligible for subsidized housing—based on non-violent, non-drug-related misdemeanors.

41.     Notably, the DCHA evaluated Mr. Alexander's application for eligibility for assisted housing, and did not reject him based on his misdemeanor conviction or on any other grounds.   *See* 14 D.C.M.R. §§ 6109.1, 6109.3, 6109.4(d) (outlining DCHA's eligibility guidelines for public housing and the Housing Choice Voucher Program, including allowance for consideration of convictions involving "physical violence against persons or property or other criminal convictions that may adversely affect the health, safety, or welfare of other DCHA residents, staff, or other members of the community . . . ."  so long as the DCHA similarly assesses the time, nature, extent of the conduct, and mitigating circumstances for any prior convictions,  *id.* at § 6109.6).

42.     In addition, federal regulations require assisted housing providers to adopt a "written tenant selection plan ["TSP"] in accordance with HUD requirements."  24 C.F.R. §§ 5.655(a) & (b)(2).

43.     The policies and practices that are employed by the Rental Property Defendants fall short of these standards, to which, upon information and belief, they are also required to adhere pursuant to their contractual agreements with the DCHA.

44.     Defendant The View—which is managed and operated by Defendants Edgewood and CPDC—employs the Edgewood "Eligibility Requirements" as its TSP.  The View's TSP requires all applicants to submit to a background check for the past three years and provides that applicants may be excluded for *any* felony or misdemeanor convictions during that period "for violent or harmful conduct or conduct that involved a threat of violence or harm against other." Edgewood Eligibility Requirements, at 24-25.

45.     The View's policy and applied practice do not comply with the limited criminal ineligibility criteria authorized under federal law.  The View's denial of Mr. Alexander's application based on a seven-year old misdemeanor violated The View's own policies as well as federal law.  This was explained in the June 19 letter to The View from Mr. Alexander's counsel, to which no response was received.

46.     Upon information and belief, The Overlook—which is also managed and operated by Defendants Edgewood and CPDC—utilizes the same TSP as The View.

47.     The Overlook's policy and applied practice do not comply with the limited criminal ineligibility criteria authorized under federal law.  The Overlook's decision to deny Mr. Alexander's application based on a seven-year old misdemeanor violated The Overlook's own policies as well as federal law.  This was explained in the June 30 letter to The Overlook from Mr. Alexander's counsel.  In addition, The Overlook did not provide Mr. Alexander or his counsel with a copy of its TSP as requested in the June 30 letter, which The Overlook was required to provide.  As Mr. Alexander's counsel further explained, The Overlook's practice of rejecting applicants like Mr. Alexander does not comply with the limited criminal ineligibility criteria authorized under federal law.  No response to the June 30 letter was received.

48.     Capitol Gateway—which is managed by Defendant A&R—employs a TSP providing that an applicant may be excluded if a potential tenant has been convicted of:  (i) a sex offense, or (ii) a felony crime or drug offense, within the last 10 years.

49.     Capitol Gateway's TSP extends past a "reasonable time" and goes beyond federal law authorizing the exclusion of applicants with violent crimes.  Capitol Gateway's decision to deny Mr. Alexander's application based on a seven-year old misdemeanor violated Capital

Gateway's own policies as well as federal law. This was explained in the June 30, 2014, letter to Capitol Gateway from Mr. Alexander's counsel, to which no response was received.

50.     As a result of Defendants' unlawful policies and practices, Mr. Alexander suffered substantial injury, including, *inter alia*, denial of housing and fair housing opportunities, prolonged homelessness from the Spring of 2014 until he eventually obtained housing through DCHA in late 2014, and separation from his minor son, physical suffering, and emotional distress during that prolonged period of homelessness.

51.     By their refusal to make housing available to Mr. Alexander during 2014, refusal to change their policies and practices to conform with federal law, violations of their own policies as well as federal law, and failure to respond to the appeals of Mr. Alexander and his counsel, Defendants engaged in ongoing violations of Mr. Alexander's rights to fair housing and to be free from discriminatory conduct.

**E.      The Discriminatory Effects of Defendants' Policies and Practices on African-Americans**

52.     Defendants' policies and practices have a discriminatory effect on African-Americans eligible for public or assisted housing.  The number of Americans who have an arrest or conviction record has multiplied in recent decades, leading to an increase in the number of applicants denied housing based on criminal background checks.  African-Americans have been disproportionately affected by these national trends because of racial disparities in the criminal justice system.  Individuals eligible for assisted housing at the Rental Property Defendants come from the Washington, D.C. metropolitan area.

53.     In the Washington, D.C. metropolitan area, a disproportionate number of persons arrested, convicted, and incarcerated are African-American.  According to information published by the D.C. Sentencing and Criminal Code Revision Commission ("Commission"), historically,

on an annual basis, over 90% of the persons convicted of a crime in Washington, D.C. have been African-American, even though African-Americans constituted roughly 60% of the total population in the 1990s and 2000s. For example, between 1993 and 1998, 95% of the individuals convicted were African American. Similarly, between 1996 and June 2002, African - Americans represented 94.1% of criminal convictions.

54. The data published by the Commission indicates that these historical trends of disproportionate convictions of African-Americans continue to this day. From 2009 to 2012, over 90% of the persons convicted of crimes in the District of Columbia were African-American, despite African-Americans constituting roughly 50% of the total population in 2010:

| Year | Percentage |
|------|------------|
| 2009 | 96.2% |
| 2010 | 96.6% |
| 2011 | 95.3% |
| 2012 | 92.4% |

55. African-Americans in the Washington, D.C. metropolitan area are incarcerated at rates significantly higher than whites. According to U.S. Census data, in each of the area's jurisdictions, a disproportionate number of persons detained in local jails in 2010 were African-American compared to the demographics of the population:

| Jurisdiction | Percentage Black (Population) | Percentage Black (Detained) |
|---|---|---|
| Washington, D.C. | 50.7% | 87.4% |
| Montgomery Cnty., Md. | 17.2% | 54.8% |
| Prince George's Cnty., Md. | 64.5% | 79.05% |
| Arlington Cnty., Va. | 8.5% | 57.17% |
| Fairfax Cnty., Va. | 9.2% | 38.11% |
| City of Alexandria, Va. | 21.8% | 52.75% |

56.     Based on data from the Bureau of Justice Statistics, African-Americans are incarcerated at 19 times the rate of whites in the District of Columbia.  African-Americans also experience disproportionate rates of incarceration in Maryland and Virginia (5.5 and 5.9 times the rate of whites, respectively).  Marc Mauer & Ryan S. King, Uneven Justice:  State Rates of Incarceration by Race and Ethnicity 11 (Sentencing Project, July 2007).  Stated differently, African-Americans are overrepresented in prisons and jails.  African-Americans represent 68% of Maryland's incarcerated population but only 29% of the state's total population.  Similarly, African-Americans constitute 58% of incarcerated individuals but only 19% of the total population in Virginia.  Prison Policy Initiative, 50 State Incarceration Profiles.

57.     By establishing TSPs that go beyond federal law authorizing the exclusion of applicants with violent or drug-related crimes, the Defendants' policies and practices have a disparate impact on African-Americans eligible for public or assisted housing, like Mr. Alexander, by excluding them from renting subsidized housing units.  Simply stated, more African-Americans are precluded from public or assisted housing—or have otherwise

experienced adverse decisions on public or assisted housing applications—from the Defendants'

policies and practices than individuals of other races.

<u>CLAIMS FOR RELIEF</u>

**COUNT I**
**Violation of Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act"), 42 U.S.C.**
**§§ 3601 *et seq.***

**(Plaintiff against Defendants Edgewood, CPDC, and The View ("The View Defendants"))**

58.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

59.     Section 804 of the Fair Housing Act makes it unlawful, among other practices, to

"otherwise make unavailable or deny[] a dwelling," to an individual on the basis of race.  42

U.S.C. § 3604(a).

60.     The View Defendants' overly broad Tenant Selection Policy and practice

excludes applicants from The View based on irrelevant and dated criminal convictions with the

effect of "otherwise mak[ing] unavailable or den[ying][] a dwelling," to the applicant on the

basis of race.  Moreover, The View Defendants' restrictive application of their Tenant Selection

Policy in contravention of the policy, and resulting decision to deny Plaintiff housing based on a

seven-year old non-drug or violence-related misdemeanor conviction, has harmed, and continues

to harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of 42

U.S.C. §§ 3601 *et seq.*  In addition, The View Defendants' "fraud alert" basis for its decision

served as a pretext to denying Plaintiff housing on the basis of race, given the fact that Plaintiff

was the victim (and not the perpetrator) of fraud.

61.     The View Defendants' written Tenant Selection Policy and its practice of making

assisted housing decisions contradicting that Policy results in a disparate impact on African-

Americans and has limited relation (TSP as written) or no relation (TSP as implemented) to

ensuring the safety, health, and quiet enjoyment of The View's existing tenants.  In Plaintiff's

case, The View Defendants' failure to assess the timeframe, nature, and effect of Plaintiff's misdemeanor conviction demonstrate how their practice fails to comply with federal law and their own policy.  Even if The View Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at The View that would serve the same legitimate purpose.

62.     The View Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

## COUNT II
### Violation of the D.C. Human Rights Act, D.C. Code §§ 2-1401 *et seq.*

**(Plaintiff against Defendants Edgewood, CPDC, and The View ("The View Defendants"))**

63.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

64.     The DCHRA makes it an unlawful discriminatory practice to "refuse or fail to initiate or conduct any transaction in real property" when such refusal is "wholly or partially for a discriminatory reason based on the actual or perceived[] race . . . of any individual."  D.C. Code § 2-1402.21(a).  Further, the DCHRA specifies that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter [Chapter 14. Human Rights] shall be deemed to be an unlawful discriminatory practice."  D.C. Code § 2-1402.68.

65.     The View Defendants' overly broad Tenant Selection Policy and practice excludes applicants from The View based on irrelevant and dated criminal convictions with the effect of "refus[ing] to . . . conduct [a] transaction in real property" with the applicant on the basis of race.  Moreover, The View Defendants' restrictive application of their Tenant Selection Policy in contravention of the policy and resulting decision to deny Plaintiff housing based on a

seven-year old non-drug or violence-related misdemeanor conviction has harmed, and continues to harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of D.C. Code §§ 2-1401 *et seq.* In addition, The View Defendants' "fraud alert" basis for its decision served as a pretext to denying Plaintiff housing on the basis of race, given the fact that Plaintiff was the victim (and not the perpetrator) of fraud.

66.     The View Defendants' written Tenant Selection Policy and its practice of making assisted housing decisions contradicting that Policy results in a disparate impact on African-Americans and has limited relation (TSP as written) or no relation (TSP as implemented) to ensuring the safety, health, and quiet enjoyment of The View's existing tenants. In Plaintiff's case, The View Defendants' failure to assess the timeframe, nature, and effect of Plaintiff's misdemeanor conviction demonstrate how their practice fails to comply with federal law and their own policy. Even if The View Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at The View that would serve the same legitimate purpose.

67.     The View Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

## COUNT III
### Breach of Contract

**(Plaintiff against Defendants Edgewood, CPDC, and The View ("The View Defendants"))**

68.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

69.     The View Defendants entered into express or implied contractual commitments with the DCHA governing the provision of assisted housing to eligible applicants.

70.     Applicants for assisted housing at The View were intended beneficiaries of those contractual commitments.

71.     The View Defendants were contractually obligated to establish and adhere to reasonable and non-discriminatory tenant selection policies and practices in accordance with federal law.

72.     The View Defendants breached these contractual commitments and contradicted their own tenant selection policies by denying assisted housing to Plaintiff based on a seven-year old misdemeanor that was not drug or violence related.

73.     Plaintiff has been harmed as a result of this contractual breach.

## COUNT IV

### Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*

### (Plaintiff against Defendants Edgewood, CPDC, and The Overlook ("The Overlook Defendants"))

74.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

75.     The Overlook Defendants' overly broad Tenant Selection Policy and practice excludes applicants from The Overlook based on an applicant's irrelevant and dated criminal history with the effect of "otherwise mak[ing] unavailable or den[ying][] a dwelling," to the applicant on the basis of race.  Moreover, The Overlook Defendants' practice of applying The Overlook's Tenant Selection Policy more restrictively than required under the written policy and resulting decision to deny Plaintiff housing based on a seven-year old non-drug or violence-related misdemeanor conviction has harmed, and continues to harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of 42 U.S.C. §§ 3601 *et seq.*  In addition, The Overlook Defendants' "rent-to-income" basis for their decision served as a pretext to denying Plaintiff housing on the basis of race, given the fact that Plaintiff's rent-to-income

ratio is irrelevant in calculating rent payment to The Overlook Defendants as Plaintiff's total rent payment could not exceed approximately 30 percent of his monthly adjusted income.

76.    The Overlook Defendants' written Tenant Selection Policy and its practice of making assisted housing decisions contradicting that Policy results in a disparate impact on African-Americans and has limited relation (TSP as written) or no relation (TSP as implemented) to ensuring the safety, health, and quiet enjoyment of The Overlook's existing tenants.  In Plaintiff's case, The Overlook Defendants' failure to assess the timeframe, nature and effect of Plaintiff's misdemeanor conviction demonstrate how their practice fails to comply with federal law and their own policy.  Even if The Overlook Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at The Overlook that would serve the same legitimate purpose.

77.    The Overlook Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

**COUNT V**
**Violation of the D.C. Human Rights Act, D.C. Code §§ 2-1401 *et seq.***

**(Plaintiff against Defendants Edgewood, CPDC, and The Overlook ("The Overlook Defendants"))**

78.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

79.    The Overlook Defendants' overly broad Tenant Selection Policy and practice excludes applicants from The Overlook based on irrelevant and dated criminal convictions with the effect of "refus[ing] to . . . conduct [a] transaction in real property" with the applicant on the basis of race.  Moreover, The Overlook Defendants' restrictive application of their Tenant Selection Policy in contravention of the policy and resulting decision to deny Plaintiff housing

based on a seven-year old non-drug or violence-related misdemeanor conviction has harmed, and continues to harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of D.C. Code §§ 2-1401 *et seq.*  In addition, The Overlook Defendants' "rent-to-income" basis for its decision served as a pretext to denying Plaintiff housing on the basis of race, given the fact that Plaintiff's rent-to-income ratio is irrelevant in calculating rent payment to The Overlook Defendants as Plaintiff's total rent payment could not exceed approximately 30 percent of his monthly adjusted income.

80.     The Overlook Defendants' written Tenant Selection Policy and its practice of making assisted housing decisions contradicting that Policy results in a disparate impact on African-Americans and has limited relation (TSP as written) or no relation (TSP as implemented) to ensuring the safety, health, and quiet enjoyment of The Overlook's existing tenants.  In Plaintiff's case, The Overlook Defendants' failure to assess the timeframe, nature and effect of Plaintiff's misdemeanor conviction demonstrate how their practice fails to comply with federal law.  Even if The Overlook Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at The Overlook that would serve the same legitimate purpose.

81.     The Overlook Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

**COUNT VI**
**Breach of Contract**

**(Plaintiff against Defendants Edgewood, CPDC, and The Overlook ("The Overlook Defendants"))**

82.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

83.    The Overlook Defendants entered into express or implied contractual commitments with the DCHA governing the provision of assisted housing to eligible applicants.

84.    Applicants for assisted housing at The Overlook were intended beneficiaries of those contractual commitments.

85.    The Overlook Defendants were contractually obligated to establish and adhere to reasonable and non-discriminatory tenant selection policies and practices in accordance with federal law.

86.    The Overlook Defendants breached these contractual commitments and contradicted their own tenant selection policies by denying assisted housing to Plaintiff based on a seven-year old misdemeanor that was not drug or violence related.

87.    Plaintiff has been harmed as a result of this contractual breach.

**COUNT VII**
**Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.***

**(Plaintiff against Defendants A&R and Capitol Gateway ("Capitol Gateway Defendants"))**

88.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

89.    The Capitol Gateway Defendants' overly broad Tenant Selection Policy and practice excludes applicants from Capitol Gateway based on irrelevant criminal convictions with the effect of "otherwise mak[ing] unavailable or den[ying][] a dwelling," to the applicant on the basis of race.  Moreover, the Capitol Gateway Defendants' restrictive application of their Tenant Selection Policy in contravention of the policy and resulting decision to deny Plaintiff housing based on a non-drug or violence-related misdemeanor conviction has harmed, and continues to harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of 42 U.S.C. §§ 3601 *et seq.*

90.     The Capitol Gateway Defendants' written Tenant Selection Policy and its practice of making assisted housing decisions contradicting that Policy results in a disparate impact on African-Americans and has no relation to ensuring the safety, health, and quiet enjoyment of Capitol Gateway's existing tenants.  In Plaintiff's case, the Capitol Gateway Defendants' failure to assess the nature and effect of Plaintiff's misdemeanor conviction demonstrate how their policy and practice fail to comply with federal law and their own policy.  Even if the Capitol Gateway Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at Capitol Gateway that would serve the same legitimate purpose.

91.     The Capitol Gateway Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

**COUNT VIII**
**Violation of the D.C. Human Rights Act, D.C. Code §§ 2-1401 *et seq.***

**(Plaintiff against Defendants A&R and Capitol Gateway ("Capitol Gateway Defendants"))**

92.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

93.     The Capitol Gateway Defendants' overly broad Tenant Selection Policy and practice excludes applicants from Capitol Gateway based on irrelevant criminal convictions with the effect of "refus[ing] to . . . conduct [a] transaction in real property" with the applicant on the basis of race.  Moreover, the Capitol Gateway Defendants' restrictive application of their Tenant Selection Policy in contravention of the policy and resulting decision to deny Plaintiff housing based on a non-drug or violence-related misdemeanor conviction has harmed, and continues to

harm, Plaintiff and constitutes unlawful discrimination on the basis of race in violation of D.C. Code §§ 2-1401 *et seq.*

94.     The Capitol Gateway Defendants' written Tenant Selection Policy and its practice of making assisted housing decisions contradicting that Policy results in a disparate impact on African-Americans and has no relation to ensuring the safety, health, and quiet enjoyment of Capitol Gateway's existing tenants.  In Plaintiff's case, the Capitol Gateway Defendants' failure to assess the nature and effect of Plaintiff's misdemeanor conviction demonstrate how their policy and practice fail to comply with federal law and their own policy.  Even if the Capitol Gateway Defendants' policy and practice related to their valid interests in disqualifying certain applicants for prior criminal activity, there are less discriminatory alternatives available in determining applicant eligibility for housing at Capitol Gateway that would serve the same legitimate purpose.

95.     The Capitol Gateway Defendants' conduct has harmed Plaintiff, an African-American D.C. resident, by denying Plaintiff assisted housing intended for low-income individuals such as Plaintiff and perpetuating unreasonable assisted housing tenant selection policies and practices.

## COUNT IX
## Breach of Contract

**(Plaintiff against Defendants A&R and Capitol Gateway ("Capitol Gateway Defendants"))**

96.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

97.     The Capitol Gateway Defendants entered into express or implied contractual commitments with the DCHA governing the provision of assisted housing to eligible applicants.

98.     Applicants for assisted housing at Capitol Gateway were intended beneficiaries of those contractual commitments.

99.     The Capitol Gateway Defendants were contractually obligated to establish and adhere to reasonable and non-discriminatory tenant selection policies and practices in accordance with federal law.

100.    The Capitol Gateway Defendants breached these contractual commitments and contradicted their own tenant selection policies by denying assisted housing to Plaintiff based on a misdemeanor that was not drug or violence related.

101.    Plaintiff has been harmed as a result of this contractual breach.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court issue and award:

102.    A permanent injunction against Defendants, and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the unlawful policies, practices, customs, and usages set forth herein;

103.    Compensatory damages for emotional distress and other injury suffered by Plaintiff;

104.    Punitive damages;

105.    Costs incurred, including reasonable attorneys' fees to the extent allowable by law, including but not limited to 42 U.S.C. § 3613(c)(2);

106.    Pre-judgment and post-judgment interest, as provided by law; and

107.    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

108.    Plaintiff hereby demands a trial by jury on all issues raised in the Complaint.

Dated:  July 16, 2015
         Washington, D.C.

Respectfully submitted,

*/s/  Steven J. Routh*
Steven J. Routh (D.C. Bar No. 376068)
Christopher J. Siebens[*]
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 Fifteenth Street, N.W.,
Washington, D.C. 20005
Telephone: (202) 339-8400
Facsimile: +1-202-339-8500

Elliot Mincberg (D.C. Bar No. 941575)
Catherine Cone[*]
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.,
Suite 400
Washington, D.C. 20036
Telephone: (202) 319-1000
Facsimile: (202) 319-1010

*Counsel for Plaintiff Maurice A. Alexander*

---

[*] Motions for admission *pro hac vice* filed herewith.