718 A.2d 137
District of Columbia Court of Appeals.

Maurice A. ALEXANDER, Appellant,
v.
UNITED STATES, Appellee.

Nos. 91–CF–304, 96–CO–1255. |
Argued April 2, 1998. | Decided Sept.
24, 1998.

Defendant was convicted in the Superior Court, Warren R. King, Trial Judge, and Stephen G. Milliken, Motions Judge, of assault with dangerous weapon, possession of firearm during crime of violence, possession of unregistered firearm, and unlawful possession of ammunition. Defendant appealed. The Court of Appeals, Belson, Senior Judge, held that: (1) prosecutor impermissibly raised significance of defendant's post-*Miranda* silence at trial, and (2) prosecutor's impermissible impeachment of defendant with post-*Miranda* silence was not harmless.

Reversed and remanded.

**Attorneys and Law Firms**

**\*138** Richard Greenlee, Public Defender Service, with whom James Klein, David Reiser, Gretchen Franklin, Public Defender Service, were on the brief for appellant.

Carolyn E. Becker, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher and Mary–Patrice Brown, Assistant United States Attorneys, were on the brief for appellee.

Before FARRELL and RUIZ, Associate Judges, and BELSON, Senior Judge.

**Opinion**

BELSON, Senior Judge:

Following a jury trial, appellant was convicted of assault with a dangerous weapon[1] as a lesser-included offense of assault with intent to kill while armed,[2] possession of a firearm during a crime of violence,[3] possession of an unregistered firearm,[4] and unlawful possession of ammunition.[5] Appellant then filed a motion and a supplemental motion, pursuant to D.C.Code § 23–110 (1996), claiming ineffective assistance of counsel. The motion was denied following a hearing. In this consolidated appeal, appellant challenges his convictions and the denial of his ineffective assistance of counsel claim.

Appellant argues that (1) the trial court erred in allowing the prosecutor, over objection, to cross-examine appellant about his pre- and post-*Miranda*[6] silence regarding alibi; (2) the trial court erred by instructing the jury, over objection, on assault with a dangerous weapon as a lesser-included offense of the charged offense of assault with intent to kill; and (3) the trial court abused its discretion by denying appellant's motion to vacate the convictions, pursuant to D.C.Code § 23–110, for ineffective assistance of counsel at several key junctures during the trial.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Holding that the trial court committed prejudicial error by allowing the prosecutor to draw and argue negative inferences from appellant's post-*Miranda* silence, we reverse and remand for a new trial.


# I.

At the time of the incident at issue in this appeal, complainant Tawauna Wiley, appellant Maurice Alexander and appellant's wife Andrea, who is complainant's sister, lived together in a house they jointly owned, along with complainant's twelve-year-old son Charles. Complainant's older son, John Wiggins, was also staying at the house on a temporary basis until his apartment was ready for occupancy, and complainant's boyfriend, Chester Anderson, had been living at the house sporadically. Complainant had known appellant for approximately ten years. The relationship between appellant and complainant, though, had been strained since the summer of 1988.

At trial, complainant Wiley testified that as she was preparing dinner in the kitchen of **\*139** the house on the evening of April 12, 1989, she saw appellant enter the kitchen and close the door. Ms. Wiley then found herself on the floor, heard a noise behind her ear and felt a stinging sensation in her face. She pushed Mr. Alexander away, ran upstairs, took her younger son Charles into her bedroom, and instructed him to lock the door and call the police. Complainant told the police dispatcher that "Maurice Alexander" had assaulted her. After the police and paramedics had arrived, Ms.

Wiley saw appellant standing in the hallway. Mr. Alexander said, "Oh, my God, what happened"?, and Wiley screamed, "Get him away from me; get him away from me." Following the incident, Wiley was taken to Washington Hospital Center where she was treated for a gunshot <u>wound</u>.

Wiley also testified that the previous day she had seen Alexander and her older son John standing outside of her room at 6:30 a.m. She remembered that her son had said that "nobody is going to pull a gun on me." Wiley grabbed her son and pulled him into her bedroom, thereby ending the incident.

Metropolitan Police Department Officer Thomas Cole testified that he responded to a radio run, and upon arrival at approximately 7:30 p.m., saw appellant walking toward the house. Alexander wanted to know if there was a problem in the house and he identified himself as a resident. Alexander gave the front door key to Metropolitan Police Department Officer Gerald Dixon, who unlocked the door. The officers told appellant to wait outside, then they entered the house, followed a blood trail upstairs, and found complainant Wiley in an excited state. The officers tried to calm her down, but when she saw Alexander, who had entered the house and was standing behind the officers, she began screaming, "He shot me," and pointing at appellant.

Officer Cole questioned Alexander, who then showed the officer a gun under the bed in his bedroom. No fingerprints were recovered from the gun, but Metropolitan Police Department Sergeant Hogue testified that he detected that the gun had an odor as if it had been recently fired. Subsequently,

Alexander was taken to a police precinct and formally placed under arrest, after which he signed an acknowledgment of having been read his *Miranda* rights. He declined to answer questions.

The defense presented Officer Dixon, who testified that he arrived at the house about the same time as Officer Cole, and saw appellant going up the stairs to the house. The defense also called appellant's neighbors, who supported his contention that he was not at home at the time of the shooting. One of the neighbors also testified as to Alexander's reputation for truth and non-violence. William Welch, an expert in firearms identification and fingerprinting, testified that it was not possible to link bullet fragments depicted in Ms. Wiley's x-rays with any particular gun, and that the "sniff test" performed by Officer Hogue was an unreliable indicator of whether the gun had been recently fired.

Helleen Allen testified that she had been discussing work-related problems with appellant away from the house at the time of the shooting. She was questioned about why she had not alerted the police to this fact previously.

Appellant Alexander testified on his own behalf. He contended that he was not at the house at the time of the shooting, but rather was with Ms. Allen. Alexander stated that he was stopping off at home to pick up some flyers to distribute when he ran into the police and first learned of the shooting. The prosecutor questioned him about his silence as to alibi on the night of his arrest.

Alexander also described the difficulties between himself and complainant's older son. He explained that he had discovered a gun and drugs belonging to complainant's son John in the attic of the house. Alexander hid the gun and discarded the drugs. He testified that on the morning before the incident, he had a confrontation with John, who was searching for the contraband. The government asked Alexander why he did not mention the discovery of the drugs and gun to Ms. Wiley or to Juan Rivera, the godfather of John, who had visited the house and had spoken with Alexander and John as a peacemaker after the contraband was discovered.

## *140 II.

Appellant first contends that the trial court erred by permitting the government to question him about his failure to mention his alibi to the police the night he was arrested. The government responds by arguing that the prosecutor's comments were limited to Alexander's silence before he was read his *Miranda* rights and, in the alternative, that to the extent there was error it was harmless in light of the government's strong case.

[1]      During the government's cross-examination of Alexander, the following colloquy took place:

(Bench Conference.)

[PROSECUTOR]: I thought it better to come to the bench just to touch on this one matter before I got into it. It's my understanding that night, Your Honor,

that he mentioned about the flyers, that's why he was home. And he never mentioned having been with Ms. Allen that night to the police, and I'd like to get into that, if I can. But I thought I ought to come to the Court first.

THE COURT: Any reason why he can't—

[DEFENSE COUNSEL]: Well, any discussion with all of these people, it seems to me that what he didn't say, might not have said. He didn't tell the police about that incident with John—

THE COURT: If that's the only basis for your objection, I don't see any reason why [the prosecutor] can't get into it. So, I'll allow it.

[PROSECUTOR]: Thank you.

(Open Court.)

BY [PROSECUTOR]:

...

Q Now, you knew at the time that he was talking with you that [complainant] had just accused you of doing the shooting, had [sic] you not?

A Yeah; yes, sir.

...

Q Det. Witherspoon never asked you what you were doing from the time you left work until you got to the house?

A No. No he did not.

Q But yet he asked you about the flyers?

A One of them asked me about flyers....

Q Did you tell them that that's why you were home early, was to pick up some flyers?

A Yeah, Yeah. Well, I—yeah, I'm pretty sure I told somebody that. I don't know which one.

Q *But you never told them about Ms. Allen, did you?*

A They never asked about Ms. Allen or asked me.

Q *You're being accused of shooting somebody in the head, you're allegedly with somebody else—*

A Yes.

Q *—at the time that happens, the police are confronting you, asking you about it, and you never mentioned anything about Ms. Allen?*

A At that point, [complainant] was the only person accusing me of shooting her in the head. In fact, everyone else—

Q My question was, *you never mentioned the fact that you were with Ms. Allen at the time the shooting occurred;* is that correct?

A That's correct....

Q And isn't it because, that's because you were not with Ms. Allen?

A I was with Ms. Allen. Yes.

...

(Recross Examination.)

BY [PROSECUTOR]:

Q And at no time—

THE COURT: Hold it. What are you going to get into? It's nothing new there.

[PROSECUTOR]: About him going downtown, about whether he's under arrest or—

THE COURT: All right, I'll allow that. Go ahead.

BY [PROSECUTOR]:

Q *And at no time did you ever tell them—you were arrested that [night], were you not?*

A *Yes, I eventually was arrested.*

**\*141** Q *And at no time did you ever tell them you were with Ms. Allen that night, at the time of the shooting?*

A No—

[DEFENSE COUNSEL]: Your Honor—

THE COURT: Is that an objection?

[DEFENSE COUNSEL]: Yes.

THE COURT: Overruled.

THE WITNESS: Could you repeat that?

BY [PROSECUTOR]:

Q *At no time did you ever tell them you were with Ms. Allen at the time of the shooting?*

A Well, after they had questioned me in the house, after we got to the precinct, that's when they told me I was under arrest. At that time, I told them I wanted to see an attorney.
[PROSECUTOR]: No questions. [Emphasis added.][7]

During closing, the prosecutor drew an inculpatory inference from Alexander's silence:

The alibi. And that's not a derogatory type term. It is a legal defense, ladies and gentlemen. The alibi with Mrs. Allen. He comes home. He says he was with Mrs. Allen all that time, right after—just before, a minute or so before he saw the police. He comes into the house. "Get him away. Get him away. He's the one that did it."

He knows at that moment he's being accused of shooting her. Does he say anything at all about, hey, it's impossible. I was with Mrs. Allen. Just call her. Just check it out. The police could have called her within an hour and said, hey, were you with Mr. Alexander up until 7:30 or 7:35 today? Absolutely nothing.

And why? We submit it's because she couldn't cover for the time that he was in the kitchen shooting her. *He had plenty of time with the police that night. They took him down to the station and then they*

*eventually arrested him. Never at the house, never on the way down, at any time did he ever mention Mrs. Allen.*
All of a sudden, a year-and-a-half, almost two years later, we find out he is allegedly with somebody. [Emphasis added.]⁸

[2] It is axiomatic that no inculpatory inference can be drawn from an arrestee's decision to stay silent following *Miranda* warnings.

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

**\*142** *Doyle v. Ohio,* 426 U.S. 610, 617–618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

("due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence"). This court has observed that "When the prosecution uses post-*Miranda* silence ... to attack the heart of the defense, the error is unlikely to be harmless." *Singleton v. United States,* 488 A.2d 1365, 1370 (D.C.1985) (case turned on credibility contest between appellant and complainant, so improper impeachment of appellant was not harmless error; citing *Williams v. Zahradnick,* 632 F.2d 353, 361 n. 10, 363 (4th Cir.1980) (reversal is the norm for *Doyle* violations)); *United States v. Edwards,* 576 F.2d 1152, 1155 (5th Cir.1978) (same); *Reid v. Riddle,* 550 F.2d 1003, 1004 (4th Cir.1977) (same).

[3] The government argues that when taken in context, all of the prosecutor's remarks referred to appellant's pre-*Miranda* silence, and that the prosecutor therefore did not improperly impeach appellant regarding his post-*Miranda* silence. A reading of the above-quoted transcript passages, however, refutes the government's argument. The prosecutor, in questioning appellant and in closing, repeatedly used the terms "never" and "at no time" to describe appellant's silence that night. These are broad terms that do not limit the scope of the comment or question to the pre-arrest or pre-*Miranda* time period. The prosecutor used language which, reasonably interpreted, extended not only to appellant's failure to mention his alibi before he received his *Miranda* warning, but also into the period after he received the warning. The significance of appellant's post-*Miranda* silence was therefore raised—impermissibly—by the prosecutor at trial.

[4] In the alternative, the government argues that any error was harmless. However, like *Singleton, supra,* this case was in part a contest of credibility between appellant and complainant. Any impeachment of appellant, therefore, could have an impact on the outcome of the case, and we have observed before that improper post-*Miranda* silence impeachments that "attack the heart of the defense" are "unlikely to be harmless." *Singleton, supra,* 488 A.2d at 1370. The impermissible impeachment of appellant in this case cannot be viewed as harmless; we will not engage in a contorted reading of the transcript to avoid the consequence of the prosecutor's use of an impermissible argument. This error alone is sufficient to require reversal and remand of this action.

## III.

Because we reverse due to the violation of appellant's *Miranda* right to silence, we need not reach the merits of appellant's other contentions. In order to provide guidance for any future trial of this case upon remand, however, we will discuss certain other issues raised by appellant.

## A. Appellant's Pre-*Miranda* Silence

[5] Although error in the admissibility of a defendant's pre-*Miranda* silence regarding alibi is not necessarily prejudicial, there are certain issues regarding the probative value of the silence that must be addressed before

drawing an inculpatory inference from that silence is permissible. The trial court must exercise its discretion in determining whether such silence can be used to impeach a defendant's exculpatory testimony.[9]

[6] The Supreme Court has held that "impeachment by use of prearrest silence does not violate the Fourteenth Amendment." *Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). This court has recently noted that "when the accused has not been informed of her right to remain silent because she has not yet been placed under arrest, there is no constitutional bar to the use of her pre-arrest silence for the purpose of impeachment." *Bedney v. United States,* 684 A.2d 759, 766–767 (D.C.1996). However, there are limits to the use of pre-*Miranda* silence.

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates **\*143** due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

_Fletcher v. Weir,_ 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (appellant impeached with silence after arrest but before _Miranda_ warnings given). Such limits are imposed because "[i]f the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." _United States v. Hale,_ 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).

[7]  [8] In this jurisdiction, we have developed a procedure for determining whether to allow pre-_Miranda_ silence impeachment:

> The pretrial statement to be admissible for impeachment purposes should purport to address the facts surrounding the commission of the alleged offense. The prosecutor ... must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and the court must consider whether such facts are sufficiently material that the failure to have mentioned them amounts to inconsistency.

_Hill v. United States,_ 404 A.2d 525, 531 (D.C.1979). The party wishing to impeach has the burden of demonstrating that the "prior silence was probative for credibility purposes."

[9] In reviewing this record, we note appellant's argument that there was nothing extraordinary or unnatural in his failure to mention his alibi because, he claims, he did not feel that he was seriously under suspicion for committing the crime. Although this claim is undercut by testimony concerning the complaining witness' reaction to his presence at the scene following the incident, it raises an issue concerning the probative value of appellant's silence. The initial determination of whether appellant's omission was unusual or unnatural, and therefore inconsistent with appellant's defense theory at trial, is one of fact that must be made by the trial court. _See Hill, supra,_ 404 A.2d at 531. We do not require that the trial court make explicit findings of fact on this matter. We simply note that it is the function of the trial court to determine, as a subsidiary factual matter, whether pre-_Miranda_ silence as to alibi is probative of culpability before evidence of that silence is used for the purpose of impeaching the credibility of the accused.

## B. Cross–Examination of Alibi Witness

During cross-examination of appellant's alibi witness, Ms. Allen, the prosecutor elicited testimony from her regarding her failure to report to the police that appellant was with her at the time of the incident.

[10] We have held that "a prosecutor may cross examine a defense witness concerning that witness' failure to bring information to the police or prosecutor where such questioning addresses the witness'

credibility." _Morris v. United States,_ 622 A.2d 1116, 1125 (D.C.1993) (citing _Cain v. United States,_ 532 A.2d 1001, 1005–1006 (D.C.1987)). Addressing a situation in which a defendant had already been charged with an offense and furnished counsel, the United States Court of Appeals for the District of Columbia Circuit commented:

> [N]o inference can be drawn from the fact that a witness did not go to the police when he learns they have made an arrest of a defendant for a crime committed at a time for which he can provide alibi testimony. He might reasonably presume that it was sufficient for him to relate his knowledge to the attorney retained or appointed to represent defendant.

_United States v. Young,_ 150 U.S.App.D.C. 98, 102, 463 F.2d 934, 938 (1972). Cross-examination of a defense witness regarding failure to come forward with alibi testimony, therefore, is permissible only where the circumstances are such that the witness' normal and natural course of conduct would have been to go to the authorities and furnish the exculpatory information. In the instant appeal, the questioning was as follows:

(Cross–Examination)

**\*144** BY [PROSECUTOR]:

Q Okay. Now, when did you learn that there had been a—he'd been charged with a crime during this period of time he was supposed to have been with you?

A I didn't know anything about that. Mr. Alexander wasn't at work for a couple of days. _And I had a call from a lawyer. And that's when I found out about it._

Q So that would be a couple of days later?

A _I would say maybe it was like a week later._

...

Q And when that lawyer called you did you discuss with him what had happened?

A No. He started to ask me questions about Mr. Alexander.

Q Was it about his being with you or was it just the relationship that you two had, and I don't mean that in any negative way, I mean how you knew each other?

A He more so asked me did I know Mr. Alexander. And I told him, yes, I did. And he just asked me was I with him on that particular date.

Q Did you go over the times at that particular point?

A No we didn't.

Q When did you next discuss your having been with Mr. Alexander, then?

A If I can remember, his lawyer set an appointment for us to meet.

...

Q Now, at that time did you set down and start discussing times?

A Yea, we did go over times.

Q *And then you learned that allegedly Mr. Alexander had committed a crime or allegedly committed a crime while he was with you?*

A Yea. I asked him why he was asking me all these questions.

Q All right. Well, *after you found out that he was supposedly with you when he was charged with committing a crime did you then go down to the police department to let the police know that he was with you at that time?*

A *No, I didn't go to the police station at all.*

Q Okay. So you didn't think it was important to tell the police that, hey, he couldn't have done it, he was with me?

A No, I didn't. [Emphasis added.]

Clearly, the prosecutor attempted to use Allen's failure to approach the authorities to impeach her credibility. Unfortunately, trial defense counsel failed to object to the prosecutor's questioning, and the issue comes to us under the highly deferential rubric of ineffective assistance of counsel. In any future prosecution, the trial court should consider carefully on the record before it whether the line of questioning at issue here is sufficiently probative to justify in the face of objection its use in determining the witness' credibility.

## C. Appellant's Silence as to Discovery of Drugs and Gun

At trial, defense counsel did not object when the government questioned defendant as to why he did not mention to Mr. Rivera or complainant that he had found, in the attic of the house, drugs and a gun belonging to complainant's older son.

[11] The hearing court determined that the failure to object constituted ineffective assistance of counsel because "the record did not support an inference that it would have been natural for defendant to disclose his findings to [complainant] or Mr. Rivera." *See Hill, supra,* 404 A.2d at 531 ("a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of the fact and constitutes a prima facie inconsistency"). We agree with the hearing court's finding of ineffectiveness. In any future trial of this case the hearing court's ruling regarding appellant's silence on this point should be brought to the trial court's attention so that it may consider whether the record before it, if different from the record before us, warrants a result different from that reached by the hearing court.

## D. Lesser–Included Offense Instruction

[12] Appellant also contends that the trial court erred by instructing the jury, over **\*145**

objection, on assault with a dangerous weapon as a lesser-included offense of assault with intent to kill while armed. Appellant was convicted of the lesser-included offense and acquitted of the charge of assault with intent to kill while armed. Given the evidence that we summarized at the outset, the lesser-included offense instruction was clearly appropriate, and appellant can be retried on the lesser-included offense of assault with a dangerous weapon.[10]

## IV.

For the reasons discussed above, the judgment on appeal is reversed and remanded for a new trial.

*Reversed and remanded.*

## All Citations

718 A.2d 137

## Footnotes

1    D.C.Code § 22–502 (1996).

2    D.C.Code §§ 22–501, –3202 (1996).

3    D.C.Code § 22–3204(b) (1996).

4    D.C.Code § 6–2311(a) (1995).

5    D.C.Code § 6–2361(3) (1995).

6    *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7    We recognize that objections must be made with a reasonable degree of precision in order to give the trial judge an opportunity to consider the issue raised, *see Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), but given the context in which defense counsel attempted to object here, it was apparent that counsel took issue with the government's attempt, immediately after the government brought out that appellant had been arrested, to elicit from appellant testimony to the effect that he had not mentioned being with Ms. Allen. A *Miranda* warning must be given one who is placed in custody before any further interrogation takes place. Similarly, defense counsel began, albeit somewhat inarticulately, to raise an issue about what appellant "didn't say, might not have said" when the prosecutor first advised the trial court that he wished to broach the subject of what appellant "never mentioned." On this record we are satisfied that we should regard appellant's objection to references to his post-*Miranda* silence as having been preserved. We note that the government does not argue for application of the plain error doctrine.

8    Defense counsel did not attempt to object again when the prosecutor referred in closing argument to appellant's silence regarding Ms. Allen, but instead attempted to answer the government's argument in his own closing by stating that the defense had no obligation to disclose its evidence to the government, and that if Ms. Allen had gone to the police her testimony might never have been heard. Objection to the summation presumably would have been futile, as the questioning—and thus implicitly comment on the answers—had been ruled admissible.

<u>9</u>      As was the case with respect to the issue of post-*Miranda* silence discussed above, we deal here only with the use of a
        defendant's silence for the limited purpose of impeachment.

<u>10</u>     *See Boykins v. United States,* 702 A.2d 1242, 1250 (D.C.1997) (lesser-included offense instruction is warranted when
        all elements of lesser offense are included within the offense charged and there is a sufficient evidentiary basis for the
        lesser charge).

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.