# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

MAURICE ALEXANDER,                      :

    Plaintiff,                          :

    v.                                  :        Case No. 1:15-cv-01140-RCL

EDGEWOOD MANAGEMENT                     :
CORPORATION, *et al.,*
                                        :
    Defendants.

---

## EDGEWOOD'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendants, Community Preservation and Development Company ("CPDC") and Edgewood Management Corporation ("Edgewood Management") (collectively "Edgewood"), by and through their undersigned counsel, Bonner Kiernan Trebach & Crociata, LLP, and pursuant to Rule 56, Fed. R. Civ. P. and Rule 7, L. Civ. R., hereby further support their motion for summary judgment against Plaintiff, Maurice Alexander ("Plaintiff" or "Alexander").

## I.        PRELIMINARY STATEMENT

Plaintiff has failed to produce any evidence that the challenged policy here caused a disparate impact on African Americans within the specific group of people to which the policy was applied.[1]  Unless and until Plaintiff establishes that the policy in question—here, the criminal screening component of the Tenant Selection Plans for the View and the Overlook ("Tenant Selection Plans")—had  a disparate impact on a protected class of persons, Plaintiff's claim cannot proceed to the next step of the disparate impact analysis.  As the Supreme Court

---

[1]	As discussed below, Plaintiff's argument that the policy was applied to the entire population of eligible individuals in three distinct housing markets is misplaced and leads to unsupported, speculative results insufficient to withstand summary judgment.

held in *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), where a non-moving party bears the burden of proof on a specific issue at trial, that non-moving party also bears the burden of production of evidence to overcome a motion for summary judgment challenging the non-movant's ability to prove a central element of the claim.  In effect, a disparate impact claim asserts that members of a protected class are being "filtered" out at a higher rate than whites who are exposed to the same "filter," that is, the policy in question.  Here, Edgewood has supported its motion for summary judgment with uncontroverted, admissible evidence that African Americans within the pool of persons exposed to the policy in question -- applicants for housing at the Edgewood Properties—are not disparately impacted by that policy.  The same ratio of African Americans who applied for housing at the Edgewood Properties (and were thus subject to the effects of the policy) passed through the "filter" and were accepted for housing at the Edgewood Properties.  The evidence shows that the applicants to both Edgewood properties were 98% African American and that the residents of both properties were 98% African American when Plaintiff applied for housing—2014.  The "filter" did not alter the ratio of African Americans to whites; the same ratio that entered the filter came out on the other side.

As discussed further below, Plaintiff had the burden of identifying "affirmative evidence" that Edgewood's Tenant Selection Plans resulted in a disparate impact against African Americans.  In the absence of such evidence produced by Plaintiff supporting his claim, the Court should enter summary judgment in favor of Edgewood.

Here, the Plaintiff offers only the speculative opinions of his experts, without any factual evidence that the Tenant Selection Plans actually had a disparate impact on the ability of African Americans to obtain housing at the Edgewood Properties.  Indeed, Plaintiff's own expert, Dr. Parnell, concedes that his theory of disparate impact depends on the speculative notion that some

people might be dissuaded from applying because of the criminal screening aspect of the Tenant Selection Plans. Conversely, Edgewood has offered specific, admissible evidence demonstrating that the Tenant Selection Plans, as applied to the Plaintiff in 2014, did not affect the racial makeup of the group who applied for and was accepted for housing by Edgewood.

Plaintiff has failed to overcome this affirmative showing by Edgewood on an issue for which he has the burden of proof at trial. Accordingly, the Court should enter summary final judgment in favor of Edgewood.

Plaintiff's failure to produce evidence of a disparate impact ends the inquiry and the Court need not even consider the arguments concerning business necessity, injunctive relief or punitive damages. Nevertheless, Plaintiff fails to overcome Edgewood's evidence supporting the business necessity of the criminal screening component of the Tenant Selection Plans. Edgewood has provided admissible evidence that screening out applicants with certain types of criminal history has improved the safety and quality of life of residents and staff alike. In response, Plaintiff argues without offering any evidence that there are other, less-restrictive, means of accomplishing this purpose. This is insufficient to avoid summary judgment.

Finally, Plaintiff is unable to establish any genuine issues of material fact or points of law that preclude summary judgment on Plaintiff's claims for injunctive relief and punitive damages. Accordingly, Edgewood respectfully requests that the Court enter summary final judgment in favor of Edgewood as as to all of Plaintiff's remaining claims.[2]

---

[2] Edgewood moved for summary judgment as to Plaintiff's breach of contract claims. Plaintiff subsequently withdrew his breach of contract claims in his Opposition. (*See* Opp. at p. 9, n 3.)

## II.      ARGUMENT

### A.      Edgewood Is Entitled to Summary Judgment Because Plaintiff Failed to Produce Evidence of a Disparate Impact.

The Court should enter summary judgment in favor of Edgewood, because Plaintiff failed to produce admissible evidence on an issue for which he has the burden of proof at trial.  Indeed, Plaintiff has failed to produce admissible evidence that the Tenant Selection Plans had a disparate impact on the ability of African Americans to secure housing at the Edgewood Properties.  This failure is fatal to Plaintiff's suit and renders all other arguments moot.

The entry of summary judgment is appropriate where a plaintiff, in opposing a defendant's motion for summary judgment, fails to produce sufficient evidence in support of an issue the plaintiff must prove at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue. . . Rule 56(e) therefore requires the nonmoving party to . . . designate specific facts showing that there is a genuine issue for trial."); *Crawford-El*, 523 U.S at 600 (1998) ("If the defendant-official has made a properly supported motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence  which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."); *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) ("When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.").

Plaintiff's disparate impact theory depends on two flawed assumptions: (1) that the appropriate pool of people to consider in this disparate impact analysis consists of all persons who *might apply* for housing at the Edgewood Properties; and (2) that some people within that pool of potential applicants might be dissuaded from applying because of the criminal screening part of the application process.   Notably, however, the Opposition fails to identify any evidence that anyone was dissuaded from applying because of the Tenant Selection Plans.  In addition, the Opposition does not identify how many people in the pool of potential applicants are *even looking for low-income senior housing*.  The Opposition fails to produce admissible evidence that the pool of potential applicants knew of the criminal background criteria in the Tenant Selection Plans to even make it possible for potential applicants to be dissuaded.  The Opposition likewise does not produce evidence that the Tenant Selection Plans themselves, as opposed to other factors such as location, neighborhoods, or proximity to work or school, caused potential applicants to not apply.[3]  It is entirely speculative and fails as a matter of law to preclude the entry of summary judgment in favor of Edgewood.  *See, e.g. Stewart v. White*, 61 F. Supp. 3d 118, 130 (D.D.C. 2014) ("[P]laintiff simply cannot survive summary judgment on such speculative, conclusory, and self-serving statements.")

Plaintiff relies exclusively on the analysis by his expert, Alan Parnell, Ph.D., which states that the Edgewood Tenant Selection Plans have a disparate impact because more African Americans in the District of Columbia have had contact with the criminal justice system than whites.  Dr. Parnell also theorizes that the proper pool is *potential* applicants and not *actual* applicants because some people might decide not to apply knowing that they will have to pass a

---

[3]      Indeed, theorizing that a percentage of the population of eligible renters did not apply because they presumptively knew about Edgewood's criminal screening policy, is akin to speculating that members of the population chose not to apply because the Edgewood Properties are located too far away from work.  Such guesswork is exactly the type of speculation that is insufficient to withstand summary judgment.

criminal background screening, akin to unknown, unnamed people self-selecting out of the process.  Dr. Parnell himself acknowledged that this latter theory was based on nothing but speculation as he has no evidence of anyone being dissuaded from applying because of the criminal screening.  (*See* Mem. in Support of MSJ at 15.)

Plaintiff vainly attempts to decrease the speculative nature of his self-selection theory with his own anecdotal evidence.  Indeed, the Opposition assumes that because Plaintiff "testified that after experiencing repeated rejections on the basis of criminal history, he lost hope and assumed other apartments would reject him for the same reason Defendants did," other unnamed individuals did as well.  (Opp. at 26.)  This argument fails for a few reasons.  First, Plaintiff's sample size of known individuals to claim they experienced self-selection is *one* – the Plaintiff himself.  Plaintiff's statement is conveniently self-serving and assumes that because he apparently self-selected, others did too.  Second, this argument assumes without any scintilla of evidentiary support that other "self-selectors" experienced repeated rejections on the basis of criminal history, "lost hope," and assumed other housing providers would reject them.  Plaintiff provides no factual evidence regarding how many people in the potential pool of applicants had already experienced repeated rejections.  He offers no factual support that such people "lost hope."  He offers no factual support for the theory that anyone feared that the Edgewood Properties would reject them.  Plaintiff's anecdotal, self-serving statement that he lost hope when other properties rejected him does not change the fact that his claim that other, unknown and unnamed individuals chose not to apply to Edgewood due to the criminal screening policy is based on pure speculation.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Although, as a rule, statements made by the party opposing a motion for summary judgment

must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule.")

Plaintiff's speculative theory is insufficient to satisfy his burden in opposing summary judgment, and the entry of judgment as a matter of law in favor of Edgewood is appropriate. *See, e.g. Greene*, 164 F.3d at 675 ("Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial. Because Greene's claim of retaliation rests entirely upon a conclusory representation, the district court was right to dismiss it.").

## B. The Appropriate Pool of Persons to Evaluate Consists of those Persons Actually Exposed to the Challenged Policy—the Applicants to Edgewood Properties.

### 1. Plaintiff's Reliance on *Betsey*, *Bronson*, and *Dockard* Is Misplaced.

In Plaintiff's attempt to demonstrate that a *potential* pool of applicants is the appropriate population for a disparate impact analysis, Plaintiff mainly relies on three cases: *Betsey v. Turtle Creek Associates*, 736. F.2d 983 (4th Cir. 1984); *Bronson v. Crestwood Lake Section I Holding Corp.*, 724 F. Supp. 148 (S.D.N.Y. 1989); and *Dothard v. Rawlinson*, 433 U.S. 321 (1977). Such reliance is misplaced, as explained below.

First, the holding in *Betsey* completely undermines Plaintiff's argument that the pool of potential applicants is relevant to a disparate impact analysis.  Indeed, the *Betsey* Court stated:

> Accordingly, we conclude that plaintiffs are not required to show a discriminatory impact on anyone but the existing minority residents of Building Three.  This simple verity renders consideration of the rest of the 'local community', the rest of The Point, or even prospective applicants for space in Building Three irrelevant.

*Betsey*, 736 F.2d at 987.

7

The court's holding in *Betsey* supports Edgewood's position that the proper population for a disparate impact analysis is the *population actually affected by the policy in question*; here, only the actual applicants are exposed to the Tenant Selection Plan and its criminal background screening. The court in *Betsey* held that the relevant population was the residents of the building because the "conversion policy affects only the occupants of [the subject building]." Consistent with the *Betsey* holding, any analysis regarding "prospective applicants" is "irrelevant." *Id.* at 987.

Plaintiff acknowledges this in his Opposition, by arguing that "[t]he correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." (*See* Opp. at 19.) The only people to whom the policy was applied are the people who submitted applications for housing to Edgewood. In other words, the pool of theoretical "potential applicants" was never subjected to the policy and, therefore, that population is not the proper focus of a disparate impact analysis.

In *Bronson*, 724 F. Supp. 148, plaintiffs sought a preliminary injunction to enjoin the owner of an apartment building from renting to other applicants two apartments for which the plaintiffs believed they qualified. In support of the motion, plaintiffs argued that a policy excluding applicants who received Section 8 housing had a disparate impact on minorities in Yonkers, New York. *See* 724 F. Supp 148. The *Bronson* plaintiffs submitted a statistical analysis that, on its face, may appear similar to Plaintiff's analysis here. The *Bronson* plaintiffs used the entire pool of Yonkers renters that qualified for housing and noted that only 16.7 percent of this pool were minority households. *Id.* at 154. The court granted the preliminary injunction, finding that the plaintiffs had a high likelihood of success on the merits of their disparate impact claim. *See id.*

*Bronson*, which is not legally binding on this Court, differs factually from the present matter in several significant ways, rendering the comparison inapposite. First, as noted by the *Bronson* court and unlike the present case, the *Bronson* plaintiffs presented evidence that defendant's policy rejecting Section 8 assistance recipients was motivated by racial animus towards African Americans. *See id*. at 151. For example, defendant's counsel *admitted* that the defendant sought to avoid "increase[ing] the racial 'mix' at Crestwood because it would induce white residents to leave." *Id*. The policy's discriminatory nature was further supported by the fact that the defendants ignored their policy on four occasions, renting apartments to four *white* individuals who received Section 8 assistance. *Id*. at 157-158. Indeed, the *Bronson* court stated that its decision was affected by the defendant's obvious discriminatory intent. *See id*. at 157. Specifically, the Court noted that while "intent is not a requirement of the plaintiff's prima facie case, there can be little doubt that if evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance." *Id*. The court there also explained that "defendant's inconsistent articulation and application of its tenant selection policies cast the sincerity of those policies in a somewhat questionable light." *Id*.

These facts are not present here. Indeed, there is no evidence that Edgewood has applied its policy differently to African Americans than whites, or that the goal of the Tenant Selection Plans is to discourage white residents from leaving.

Other differences between *Bronson* and the present case are evident as well. For example, the *Bronson* court was not presented with deciding a motion for summary judgment, as the *Bronson* plaintiffs filed a motion for a preliminary injunction. In this regard, the *Bronson* court considered the case under a vastly different standard of review (*inter alia*, the likelihood of

success on the merits) and found that plaintiffs had a likelihood of success on the merits at that preliminary stage of litigation.  *See id*. at 155.

Moreover, unlike the present case, the defendant in *Bronson* rejected the plaintiffs *before* actually subjecting them to a credit check, which served as the filter in that case.  *See id*. at 151. Here, it is undisputed that Edgewood considered Plaintiff's application and the Screening Software generated a rejection based on Plaintiff's 1991 felony.  Unlike the Plaintiff in this case, the *Bronson* plaintiffs did not even have the opportunity to go through the filter.

Plaintiff's reliance on *Dothard v. Rawlinson*, 433 U.S. 321 (1977), is similarly misplaced. In *Dothard*, the Alabama Board of Corrections rejected plaintiff's application for a prison guard position, because she failed to meet the minimum height and weight requirements of 5'2" and 120 pounds.  *See id*. at 323-324.   The plaintiff in *Dothard* claimed that the policy had a discriminatory impact on women.  *See id*. at 328.   The Supreme Court ruled that under the facts of the case, the general population of Alabama, as opposed to the actual applicants for the position, was the correct population for a disparate impact analysis.  *See id*. at 330 ("There is no requirement that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants.").

*Dothard* is also distinguishable from the present case, because Plaintiff has produced no evidence, outside of rank speculation, that anyone in the potential pool of applicants actually self-selected.   Indeed, since the *Dothard* Court's holding 41 years ago, other courts have distinguished this case on similar grounds.  *See, e.g. Florida State Univ. v. Sondel*, 685 So. 2d 923, 931 (Fla. 1st DCA 1996) (distinguishing *Dothard* because "there was no evidence that the application process discouraged any applicant from applying."); *Aiken v. City of Memphis*, 37 F.3d 1155, 1166-1167 (6tg Cir. 1994) (distinguishing *Dothard* from facts of case because: "First,

the qualifications for the Alabama prison guard position differed from those at issue here, in that, among other things, a felony conviction did not render one unqualified for the prison guard position. (citation omitted.)   Second, and more important, race is unlike height and weight for demographic purposes").   Similarly here, as the *Sondel* and *Aiken* courts held, Plaintiff has offered no evidence that the application process discouraged any applicant from applying, outside of his own personal anecdotal experience.   In the absence of such evidence, the plaintiff failed to prove a disparate impact claim.   Accordingly, *Dothard* does not support Plaintiff's contention that the potential pool of applicants is the correct population for this disparate impact analysis.

The facts and holdings in *Betsey, Bronson*, and *Dothard* fail to support Plaintiff's argument that the pool of potential applicants represents the proper population for a disparate impact analysis.   Indeed, these cases either support the opposite conclusion (*Betsey*) or are readily distinguishable from the present case (*Bronson, Dothard*).   Accordingly, Plaintiff's argument to the contrary is without merit.[4]

2.   Plaintiff's Analysis Regarding *Teal* Is Misplaced.

Plaintiff's reliance on *Connecticut v. Teal*, 457 U.S. 440 (1982) also fails.   In fact, the Supreme Court in *Teal* held that the appropriate pool of people to consider consists of the individuals actually subjected to the challenged policy, which supports Edgewood's position. *Teal*, 457 U.S. at 454-455 ("It is clear beyond cavil that  the obligation imposed by Title VII is to provide an equal opportunity for *each applicant* regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work

---

[4]   Plaintiff also relies on *McCraven v. City of Chicago*, 109 F. Supp. 2d 935, 944 (2000), (see Opposition at 29) which specifically requires the plaintiff in a disparate impact case "to demonstrate causation by offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of *applicants* for jobs or promotion because of their membership in a protected group.'" *Id*. (emphasis added.) *McCraven* also supports Edgewood's position here.

force.") (emphasis added).    That means that the Court here must examine the pool of *applicants*—those actually affected by the policy—as opposed to the hypothetical group of people who might one day decide to apply.

Plaintiff also unsuccessfully attempts to liken the two-step process in *Teal* to the one-step process here.   In *Teal*, the first step of the process consisted of the administration of an exam.   *See id.* at 443.   The second step consisted of the application of an affirmative action adjustment to the results generated by the exam.   *See id.* at 444.   Plaintiff argues that the first step here is the impact the Tenant Selection Plans have on individuals who would potentially apply, but for Edgewood's criminal background criteria.    Plaintiff then claims that the second step in the present case occurs when tenants actually apply, face the Tenant Selection Plans, and either obtain housing or do not.   This comparison fails because Edgewood's process is plainly different from the process at issue in *Teal*.

Plaintiff's entire premise of the purported step one is based on a theoretical, speculative potential for a disparate impact among people who may or may not have applied.   Reliance on mere speculation is insufficient to survive summary judgment.   *See Xingru Lin v. D.C.*, 268 F. Supp. 3d 91, 100 (D.D.C. 2017) citing *Haight v. O'Bannon*, 102 F. Supp. 3d 179, 182 (D.D.C. 2015) ("dismissing section 1983 claim where plaintiff 'merely speculat[ed] that some unknown MPD policy or custom *might* have been the moving force behind her injuries' because '[s]much conclusory allegations that merely recite the legal standard fall short of the requirements for pleading municipal liability.'").   Plainly, there was no first step in the present case.

The differences between *Teal* and this case become more apparent when considering the actual numbers involved and Edgewood's filter analogy.   In *Teal*, the African American pass rate on the exam was 68% of that for whites.   *Teal,* 457 U.S. at 443.   Indeed, the ratio going into the

"filter" – in *Teal,* the exam—was 259 white test takers to 48 African American test takers, a ratio of 5.4 to 1.  *See id.*   The ratio of test takers who passed the test was 206 white test takers to 26 African American test takers, as 79.66% of the white test takers passed, while only 54.17% of African American test takers passed.[5]  This creates a ratio of 7.92 to 1.[6] The white to African American ratio of test takers was 5.4 to 1; the ratio of passing whites to African Americans was 7.92 to 1.  As such, *Teal* correctly found that the test created a disparate impact, because the input ratio to the filter (the test) was different than its output ratio.

Moreover, the defendant applied an affirmative action adjustment to boost the number of African Americans that received promotions, which produced an *adjusted output* from the original output from the exam.  *Teal* held that a defendant cannot mitigate a disparate impact by adjusting the output.  The *Teal* Court characterized defendant's argument as a "bottom-line" analysis because it was relying on the adjusted output and thereby obscuring the disparate impact of the test.

Here, Edgewood is not making a "bottom-line" argument.  The input ratio of 98% African Americans before the filter -- in the present case, the Tenant Selection Plans -- was the same as the output ratio of 98% African Americans accepted to live in the Edgewood Properties.  As demonstrated above, the test in *Teal* resulted in a substantially lower ratio of African American employees becoming eligible for promotion; the criminal background check here does not have a similar effect.  Stated differently, Edgewood did not have to create an affirmative action plan to adjust its bottom line and fix the disparate impact from its filter.  The only known

---

[5]     The *Teal* Court stated that 54.17% of African American test takers passed, which means 26 out of 48 African American test takers obtained passing scores.  The Court also explained that the African American pass rate was 68% of that of the white pass rate, which produces the white pass rate of 79.66%.  Therefore, 79.66% of the 259 white test takers, or 206 out of 259, passed.

[6]     The calculations for determining ratios are as follows: 259/48 = 5.395, rounded up to 5.4; 206/26 = 7.923, which rounds down to 7.92.

"Step"—subjecting applicants to criminal screening—did not create a disparate impact.  There simply was no "Step Two" here.

Moreover, Plaintiff's argument implicitly acknowledges that the Tenant Selection Plan itself did not cause any disparate impact here.  Instead, Plaintiff argues that the speculative dissuasion of potential applicants at the purported first step was where the disparate impact occurred.  Indeed, the Opposition submits that "[t]he fact that the rate at which African American applicants are accepted in step two matches the rate at which they apply does not change the discriminatory effect of the Defendants' policy at step one."  (Opp. at p. 23.)  Plaintiff's concession that the so-called second step, where the applicants were subjected to a criminal background check, did not create a disparate impact, leaves Plaintiff relying solely on the notion that someone might have been dissuaded from applying for fear of the criminal background check.  This theory fails both for lack of evidence and because the prevailing disparate impact case law requires the court to evaluate only the pool of persons actually subjected to the challenged policy.  *See   Teal*, 457 U.S. at 454-455 (holding that the pool of applicants taking the exam, as opposed to all employees eligible for a promotion, represented the proper population for disparate impact analysis); *Betsey,* 736 F.2d at 987 (holding that plaintiff alleging disparate impact must establish that "policy in question had a disproportionate impact on the minorities in the total group to *which the policy was applied."*) (emphasis added); *Davis v. District of Columbia*, 246 F. Supp 3d 367, 369 (D.D.C. 2017) (granting defendant's motion for summary judgment "because undisputed statistical evidence" showed that a hiring process "did not have a disparate impact on African-American or older applicants"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S. Ct. 2362, 2375, 45 L. Ed. 2d 280, 301 (1975) (holding that to establish

disparate impact, plaintiff must establish that the policy in question results in a "a racial pattern significantly different from that of the pool of applicants.")

C.   **Edgewood Has Presented Admissible Evidence that the Tenant Selection Plans Were Justified by a Business Necessity; Plaintiff has Failed to Rebut this Showing.**

Even if this Court rejects Edgewood's disparate impact argument, Edgewood has established entitlement to summary final judgment under the business necessity prong of the three-step analysis in *Texas Department of Housing*, 576 U.S. ____, 135 S. Ct. 2507 (2015). Indeed, Edgewood adduced admissible evidence in the form of deposition testimony from Edgewood Senior Vice President, Terrence Kelley, attesting to the necessity of the Tenant Selection Plans for the safety of Edgewood's residents.  (*See* Mem. in Supp. at 21.)  Further, Edgewood supported its business necessity argument with the expert testimony of Dr. Wright, who testified about the importance of criminal background checks with respect to tenant safety and crime reduction.  (*See id*. at 22.)   On the other hand, Plaintiff failed to rebut Edgewood's showing of business necessity with any competent or admissible evidence.  Such failing is fatal to Plaintiff's claim.  *See Stewart,* 61 F. Supp. 3d. at 128 ("While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [the] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial.").[7]

Instead of producing "competent evidence," Plaintiff baldly states that Mr. Kelley's testimony is insufficient to support summary judgment.  (*See* Opp. at 35.)  Plaintiff then argues that Dr. Wright's opinions are invalid because he cites a Dutch study and statistics regarding

---

[7]        Notably, Plaintiff cites *Stewart* out of context in his Opposition to support a putative argument that "conclusory . . . and self-serving statements" are insufficient to support summary judgment.  (*See* Opp. at p. 35.) This statement, however, relates to the Plaintiff's burden in opposing summary judgment.  The entire sentence reads: "Plaintiff simply cannot survive summary judgment on such speculative, conclusory, and self-serving statements." *Stewart*, 61 F. Supp. 3d. at 130.

arrest data for individuals between the ages of 16 and 47.  (*See id*.)  Both points fail.  First, Dr. Wright's conclusion about the "brute fact" of criminology that the likelihood of an arrest increases with each successive arrest applies universally.  (*See* Expert Report of Dr. John Paul Wright attached to Edgewood's Memorandum in Support as Exhibit S-1, at 2.)  Similarly, the age of the criminal subjects in a study is irrelevant to overall conclusion that the use of criminal background criteria in a Tenant Selection Plan protects residents.  (*See id* at 4.)  Further, Dr. Wright's statements about the Plaintiff's violent past demonstrate that his conclusions are not overbroad statements but instead are conclusions that have an actual bearing on this case.  (*See id*.)  Although Plaintiff incorrectly states that Dr. Wright's studies have no bearing on this case, Dr. Wright's opinion is clearly relevant, as his statements about Plaintiff's violent past drive his specific conclusions on this case.  (*See id*.)

Moreover, Plaintiff's argument that other apartment buildings employ different practices is both unsupported and irrelevant to the facts here.  In other words, the fact that other apartment buildings have different criminal screening backgrounds does not refute Edgewood's business necessity argument.  (*See id* at 36.)   Plaintiff's reliance on *Conroy v. N.Y. State Dep't of Corr. Servs.,* 333 F.3d, 88, 97 (2d Cir. 2003) is thus misplaced.  Indeed, Plaintiff cites *Conroy* for the proposition that a business necessity cannot simply be "convenient or beneficial" to the business.  (*See id*.)   While Plaintiff's reliance ends there, the *Conroy* court continues that "the employer must first show that the asserted 'business necessity' is vital to the business."  *Id*. at 97.  In the very next sentence, the court concluded that ensuring the safety and security of the building satisfies the "vital to the business" standard.  *See id*. at 98.  ("For example, business necessities may include ensuring that the workplace is safe and secure. . . .")  Accordingly, *Conroy* further

supports Edgewood's showing that the criminal background criteria, designed ensure the safety and security of the Edgewood Properties, constituted a business necessity.

### D. Edgewood is Entitled to Summary Judgment on Plaintiff's Claims for Injunctive Relief.

The changes that Edgewood implemented to its criminal background screening, in adherence to the HUD Guidance (PIH-2015-19) and the D.C. "Ban the Box" Legislation (42-§3541 *et seq*.), render Plaintiff's claim for injunctive relief moot.  Plaintiff has the burden of proof at trial on his claim for injunctive relief; therefore plaintiff has the burden of production in opposing Edgewood's Motion for Summary Judgment regarding the injunctive relief claim.  *See Celotex*, 477 U.S. at 324.  Plaintiff has again failed to satisfy this burden.

Preliminarily, Plaintiff's argument that injunctive relief is necessary relies on the flawed and unsupported assumption that Edgewood violated the Fair Housing Act and District of Columbia Human Rights Act in the first place.  (*See* Opp. at 40.)  On the contrary, Edgewood's fall within with the broad discretion HUD gives housing providers in setting criminal screening parameters to ensure the safety of their residents and staff.  (*See* Mem. in Supp. at 27.)

Moreover, the Opposition fails to produce evidence to challenge Edgewood's showing that it has amended its procedures.  On the contrary, Edgewood established through the testimony of Ms. Lutz and Mr. Kelley that the new policies have been in place since April 2017.  (*See* SOMF at ¶¶59-61.)  Further, Plaintiff's claim that the polices were not in effect because Edgewood recently produced the updated Tenant Selection Plan does not rebut Edgewood's showing that *the policies* themselves *have* been in effect since April of 2017.

Finally, Edgewood has satisfactorily established that the alleged, unproven violations will not recur.  First, Plaintiff's argument that Edgewood reluctantly abandoned policies that are necessary to the safe and effective operation of their businesses mischaracterizes Mr. Kelley's

testimony.  (*See* Opp. at 41.)  Indeed, Mr. Kelley testified that amending the policy ensured that Edgewood "was most in line with the HUD guidance and still . . . protect[ing] [its] residents and their health and safety and right of reasonable enjoyment to the community and their homes." (SOMF ¶64.)   Second, the Opposition's unsupported assumption that Edgewood will "revert" to its old, purportedly discriminatory policies, is wrong.  (*See* Opp. at 42-43.)  On the contrary, Edgewood maintains that its policies are not and never have been discriminatory.  Edgewood updated the polices in response to changes in local law and rendered the policies subordinate to the local jurisdictions where they apply. (*See* Ex. G at p. 191, ll. 3-25 – p. 192, ll 1-7.)  Thus, Plaintiff's claim that Edgewood can revert back to its "discriminatory" policies is wrong.

### E.  The Purported Issues of Fact Identified by Plaintiff Are Neither Genuine Nor Material.

In the present case, all of the putative "issues of fact" Plaintiff identified in Edgewood's Statement of Facts are neither genuine nor material to the central issue in this case: Whether the Tenant Selection Plans resulted in a disparate impact on African Americans.[8]

It is well-settled that a plaintiff does not satisfy his burden on summary judgment by merely demonstrating that non-material facts are in dispute or that such disputes are irrelevant to the issues of the case.  *See Xingru Lin v. D.C.*, 268 F. Supp. 3d 91, 99 (D.D.C. 2017).  Indeed, as the District Court for the District of Columbia in *Xingru Lin* explained:

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient

---

[8]  It is important to note that Plaintiff's claim is that the Tenant Selection Plans had a disparate impact on the ability of African Americans to secure housing at The View and The Overlook.  Plaintiff *does not claim* that he was wrongfully denied because Edgewood's tenant selection software failed to discover that the 1991 felony conviction had been overturned.  Accordingly, all putative disputes identified by Plaintiff on this issue are not material.  (*See* Ex. A to Opp at ¶¶ 24, 37, 42-45.)

> admissible evidence for a reasonable trier of fact to find for the
> non-movant.

*Id*.

Plaintiff first takes issue with the data produced by DCHA and Edgewood's experts regarding the pool of applicants that applied to the Edgewood Properties.  (*See* Ex. A. to Opp. At ¶4, 5, 7, 9.)  Specifically, Plaintiff claims that the Declaration of Chiffaun Williams of DCHA regarding applicant data does not include "all" referrals.  (*See* Ex. A to Opp. at ¶4.)  However, Ms. Williams explicitly acknowledges in the affidavit that Edgewood requested "all referrals" and that she requested that DCHA's Eligibility and Continued Occupancy Division ("ECOD") perform a database search of DCHA's referrals to the Edgewood Properties.  Further, Plaintiff's repeated claim that "facts pertaining to the actual applicant pool are not material" is not only misguided, but also does not an issue of fact and instead represents Plaintiff's opinion on the proper standard.[9]  Finally, Plaintiff's argument that a large amount of data is missing is not material, as such argument does not and will not affect the outcome of the suit.  Edgewood provided all of its data regarding the applicant pool and DCHA's referral data to include the most complete set of applicants it could.  Any such dispute is not material to the main issue of this case: disparate impact against African Americans.

Moreover, Plaintiff's claim that Mr. Kelley's testimony about the safety of the Edgewood Properties constitutes an issue of material fact is misplaced.  (*See id*. at ¶¶ 26-30.)  Indeed, the veracity of Mr. Kelley's testimony has not been disputed by anyone in this case.  Plaintiff further submits that the Tenant Selection Plans themselves create an issue of fact, because certain paragraphs provide a five-year lookback period while others require an automatic rejection for any felony.  (*See id* ¶21.)  However, Plaintiff makes no assertion that Edgewood failed to

---

[9]     Indeed, in Paragraphs 4, 5, 7 and 9 of Exhibit A of the Opposition, Plaintiff attempts to liken a disagreement about the proper legal standard for disparate impact to an issue of fact.  Such attempt is without merit.

properly apply its Tenant Selection Plans—his claim is that the Tenant Selection Plans themselves created a disparate impact.  Therefore, this putative issue of fact is not material.

Plaintiff also fails to identify a genuine dispute of material fact in Paragraph 50 of the SOMF.  While the parties disagree on the meaning of the word "homeless," that dispute is simply not material to the principle assertion of Edgewood's motion for summary judgment that the Tenant Selection Plans did not have any a disparate impact on the ability of African Americans to secure housing at the Edgewood Properties.  (*See id*. at ¶50.)

Finally, Plaintiff fails to identify a genuine dispute of material fact in Paragraphs 53 and 56 of the SOMF.  While Plaintiff states that he was rejected for reasons other than his criminal history, such facts are not material to whether the Tenant Selection Plans and their criminal background screening has a disparate impact on African American's ability to rent at the Edgewood Properties.  (*See id*. at ¶¶ 53, 56.)

The material facts in this case are not genuinely disputed.   The Plaintiff applied for housing at the Edgewood Properties and was rejected under the Tenant Selection Plans' policy denying all applicants who had ever committed a felony.  It is further undisputed that 98% of the applicants to the Edgewood Properties from 2009 to 2014 were African American, and undisputed that in 2014, 98% of the tenants at the Edgewood Properties were African American. These are the "facts that might affect the outcome of the suit under the governing law" and they are not in dispute.  *See Xingru Lin*, 268 F. Supp 3d. at 99.

Accordingly, Plaintiff's identification of putative genuine issues of material facts is without merit and should not preclude the entry of summary judgment.

### III.   <u>CONCLUSION</u>

This Court should grant Edgewood's motion for summary judgment.  Edgewood has established that the Tenant Selection Plans did not result in a disparate impact against African American applicants to the Edgewood Properties.  This is supported by the uncontroverted evidence that 98% of the applicants to the Edgewood Properties between 2009 and 2014 were African American and that 98% of the Edgewood Property residents were African American in 2014, at the time the Plaintiff applied.  The Tenant Selection Plans did not disparately impact the ability of African Americans to secure housing at the Edgewood Properties.

Accordingly, the Court should enter summary final judgment in favor of Edgewood as to all claims.

WHEREFORE, for the foregoing reasons, Edgewood respectfully requests that the Court enter summary final judgment in favor of Edgewood and against the Plaintiff.

Dated: October 26, 2018

Respectfully submitted,

**COMMUNITY PRESERVATION AND
 DEVELOPMENT COMPANY AND
EDGEWOOD MANAGEMENT
CORPORATION**

By Counsel

**BONNER KIERNAN TREBACH &
 CROCIATA, LLP**

*/s/ William H. White Jr.*_____
**William H. White Jr.**
Alan S. Block, #431010
William H. White Jr., #461341
Andrew S. Bassan (Appearing *Pro Hac Vice*)
1233 20th Street, N.W. 8th Floor
Washington, D.C. 20036
ablock@bonnerkiernan.com
wwhite@bonnerkiernan.com
(202) 712-7000
(202) 712-7100 facsimile
*Attorneys for Defendants, Edgewood Management
Corporation and Community Preservation &
Development Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply Memorandum of Points and

Authorities was served via the Court's CM/ECF system on this 26th day of October, 2018 to:

Steven J. Routh
Andre Gurayah
Logan Dwyer
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, D.C. 20005

Hannah Lieberman
Tiffany Yang
Catherine Cone
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 DuPont Circle, N.W., Suite 400
Washington, D.C. 20036

*Attorneys for Plaintiff*

&

David G. Sommer
Gallagher Evelius & Jones, LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201

*Attorneys for Defendants A&R Management,*
*Inc. and East Capitol Senior Rental, LP*

*/s/ William H. White Jr.*_____
**William H. White Jr.**