## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAURICE ALEXANDER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Case No. 15-1140** |
| ) | |
| **EDGEWOOD MANAGEMENT** ) | |
| **CORPORATION,** *et al.,* ) | |
| ) | **FILED UNDER SEAL** |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Maurice Alexander, an African American man, alleges that he was wrongfully denied residence in 2014 at three public housing apartment buildings either owned, managed, or operated by the defendants: Edgewood Commons III: The View ("The View"), The Overlook at Oxon Run ("The Overlook"), and Capitol Gateway Senior Apartments ("Capitol Gateway"). Alexander claims that the internal policies justifying his denials gave rise to a disparate impact on the basis of race in violation of Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act" or "FHA"), 42 U.S.C. § 3601 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*[1] Alexander alleges that his denials caused him to become homeless, experience physical

---

[1] Alexander initially alleged third-party beneficiary breach of contract claims as well, but he subsequently withdrew those claims. Pl.'s Opp'n Defs.' Mots. Summ. J. 9 n.3, ECF No. 86.

and emotional injuries, and endure separation from his minor son.  As such, he seeks monetary damages and injunctive relief.

Defendants Community Preservation and Development Company ("CPDC") and Edgewood Management Corporation ("Edgewood Management") (collectively "the Edgewood defendants") moved for summary judgment against Alexander's claims. CPDC owns The View and The Overlook ("the Edgewood Properties") and Edgewood Management was the managing agent in 2014.

Defendants East Capitol Senior Rental LP ("East Capitol") and A&R Management, Inc. ("A&R") (collectively "the Capitol Gateway defendants") also moved for summary judgment against Alexander's claims.  East Capitol owns Capitol Gateway's physical assets and A&R was the managing agent until October 2014.

## I. Background

Alexander applied for public housing in The View, Capitol Gateway, and The Overlook in March, April, and May 2014, respectively, and was denied by each.  Am. Compl. ¶ 19, ECF No. 10.  The View denied his application because of his criminal history and a fraud alert.  *Id.* ¶ 23.  Capitol Gateway denied his application because of his criminal history.  *Id.* ¶ 29.  The Overlook denied his application because of his criminal history and an unsatisfactory rent-to-income ratio.  *Id.* ¶ 34.

Federal law permits public housing owners to reject an applicant who, "during a reasonable time preceding the date when the applicant . . . would otherwise be selected for admission," committed a violent crime, a drug-related crime, or "other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the

2

premises by other residents, the owner, or public housing agency employees." 42 U.S.C. § 13661(c).  In 2007, Alexander was convicted of a misdemeanor (attempted threats to do bodily harm) stemming from an encounter with a police officer, and he served a ten-day sentence.  Am. Compl. ¶ 8; Pl.'s Opp'n Defs.' Mots. Summ. J. at Ex. 27, ECF No. 86-31. In disputing his denials of residency, Alexander argues that this misdemeanor does not fall into any of the aforementioned crime categories.  Am. Compl. ¶ 40.  In support of this claim, Alexander notes that the District of Columbia Housing Authority, which refers possible applicants to public housing providers, "did not reject him based on his misdemeanor conviction or on any other grounds." Id. ¶ 41.

. Alexander's disparate impact claim relies on the statistical conviction rates of African American residents of the D.C. metropolitan area whose income levels fall within the eligibility range for public housing.  He cites studies and expert witness reports that demonstrate the disproportionate conviction rates of African Americans in the D.C. metropolitan area.  Id. ¶¶ 53–56.  See generally Decl. of Christopher Wildeman, ECF No. 86-3; Decl. of Allan Parnell, ECF No. 86-4.  And so, Alexander claims that both the Edgewood and Capitol Gateway defendants (collectively "the defendants") have had a disparate impact on African Americans by establishing tenant selection plans ("TSP")[2] that allegedly go beyond the criminal screening process authorized by D.C. and federal law.[3] Am. Compl. ¶ 57.

---

[2] Public housing owners are required to adopt a written TSP in accordance with U.S. Department of Housing and Urban Development requirements. 24 C.F.R. § 5.655(b).

[3] Alexander does not limit his disparate impact claim to only African American applicants but also extends it to African American residents of the D.C. metropolitan area who *could* become applicants. Am. Compl. ¶¶ 52–53, 57.

In their motion for summary judgment, the Capitol Gateway defendants counter these allegations with statistics and expert witness evidence demonstrating that their applicants and residents between 2012 and 2016 were all African Americans.   Capitol Gateway Mot. Summ. J. 12–15, ECF No. 82; *see* Exs. 6–16, 18–20, ECF Nos. 80-8–80-18, 80-20–80-22.   The Capitol Gateway defendants argue that there could not be a disparate impact on African American applicants like Alexander because no statistical disparity existed between the applicants and tenants.   Capitol Gateway Mot. Summ. J. 17–18.   The Capitol Gateway defendants insist that the relevant population for the disparate-impact analysis must be actual applicants, not potential applicants.   *Id.* at 20–23.

The Edgewood defendants counter Alexander's allegations in a similar fashion in their own motion for summary judgment.   They argue that because "the same percentage of African[]Americans who applied for housing to The Overlook and The View [(98%)] secured housing at these properties," there is no evidence of any disparate impact.[4] Edgewood Mem. Supp. 13, ECF No. 79-2; *see* Edgewood Statement Material Facts ¶¶ 5, 7, 9, ECF No. 79-1; Exs. C-1, D, E, ECF Nos. 79-8–79-10.   Like the Capitol Gateway defendants, the Edgewood defendants argue that this Court should look only to the actual pool of applicants when examining whether their TSPs disparately impacted African Americans.   *See* Edgewood Mem. Supp. 16.

---

[4] Additionally, the Edgewood defendants submitted Dr. William A.V. Clark's expert witness report and deposition testimony, which also reject that there are any statistical disparities between applicants to The Overlook and The View and their residents. *See generally* Edgewood Mot. Summ. J. at Exs. R, R-1, ECF Nos. 79-36, 79-37.

4

The Edgewood defendants also claim that both The View and The Overlook rejected Alexander's application because of his 1991 conviction for assault with a deadly weapon. Edgewood Statement Material Facts ¶¶ 53, 56; *see* Exs. J-3, J-4, J-5, ECF Nos. 79-20–79-22. That conviction was eventually vacated, but the vacation information did not appear on his criminal background check. *See* Edgewood Mot. Summ. J. at Exs. L-5, J-5, ECF Nos. 79-28, 79-22.

Alexander seeks, inter alia, a permanent injunction against the defendants and their agents from engaging in allegedly unlawful tenant-selection practices, compensatory damages for emotional distress and other injuries, punitive damages, and attorneys' fees. Am. Compl. ¶¶ 102–107. For the reasons that follow, Alexander fails to establish a prima facie case of disparate impact. Accordingly, this Court will grant the defendants' motions for summary judgment.

## II.  Legal Standard

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law on which each claim rests determines which facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In assessing whether any genuine factual issues exist, a court must "draw all reasonable inferences in favor of the nonmoving party" without "mak[ing] credibility

determinations or weigh[ing] the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The nonmoving party must still establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. To prevail on its motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence." *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968) ("[A]ll that is required [to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.").

**III. Analysis**

According to the FHA, it is unlawful to "make unavailable or deny[] a dwelling to any person because of race." 42 U.S.C. § 3604(a). Similarly, the DCHRA prohibits the "refus[al] or fail[ure] to initiate or conduct any transaction in real property" if the refusal is "wholly or partially for a discriminatory reason based on the actual or perceived[] race . . . of any individual." D.C. Code § 2-1402.21(a)(1). Another provision of the

DCHRA states that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." § 2-1402.68.

The D.C. Court of Appeals has long recognized the right to bring a disparate-impact claim under the DCHRA. *See Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987). More recently, the U.S. Supreme Court recognized the right to bring a disparate-impact claim under the FHA. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015). In doing so, the Supreme Court borrowed heavily from its own employment discrimination precedents. *See id.* As such, this Court will do the same. Additionally, the DCHRA "tracks [the FHA] in all respects relevant to this case," so this Court will treat Alexander's DCHRA claims as coextensive with his FHA claims. *Davis v. District of Columbia*, No. 17-7071, 2019 U.S. App. LEXIS 17124, at *15 (D.C. Cir. June 7, 2019).

To establish a prima facie case of disparate impact, a plaintiff must demonstrate that a facially neutral policy has a disproportionately adverse effect on a protected class of people. *Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115, 130 (D.D.C. 2011) (citing *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009)). The plaintiff bears the burden of identifying such a policy and establishing a causal connection between that policy and a discriminatory outcome. *See Inclusive Cmtys.*, 135 S. Ct. at 2523 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."); *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to

show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."). The plaintiff must prove that the challenged policy "select[s] applicants . . . in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). Statistical evidence is crucial to proving such a racial pattern. *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984).

If the plaintiff's prima facie burden is met, "the burden shifts to the defendant to 'prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Inclusive Cmtys.*, 135 S. Ct. at 2514–15 (alteration in original) (quoting 24 C.F.R. § 100.500(c)(2)). If the defendant satisfies this burden, the "plaintiff may 'prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" *Id.* at 2515 (quoting 24 C.F.R. § 100.500(c)(3)).

*A. Disparate Impact on Actual Applicants*

It is difficult to imagine a scenario in which a public housing provider is responsible for tenant-selection policies that disparately impact African Americans when that provider's housing units are overwhelmingly or completely inhabited by African Americans. But that said, Alexander correctly argues that this Court must scrutinize how the defendants arrived at their demographic compositions to ensure that each individual applicant was not discriminated against by allegedly unlawful TSPs. Alexander finds support for this argument in *Connecticut v. Teal*, 457 U.S. 440 (1982).

8

In *Teal*, the employer argued that its promotion policies did not have a disparate impact on African American employees because the "bottom-line" result of its policies was the hiring of an appropriate racial balance of candidates. 457 U.S. at 442. The dispute arose from the employer's use of a written test as an additional hurdle for candidates to qualify for a promotion to supervisor status. *Id.* at 443. Only 54.17% of the African American candidates passed the exam, which was approximately 68% of the white candidates' passing rate. *Id.* Although a lower percentage of otherwise qualified African American candidates passed the exam, the employer applied an affirmative-action program to "ensure a significant number of minority supervisors." *Id.* at 444. Of the forty-six promoted candidates, eleven were African American and thirty-five were white. *Id.* The "bottom-line" results indicated that 22.9% of African American candidates received promotions, but only 13.5% of white candidates received promotions. *Id.* The employer argued that these statistics, by virtue of being more favorable to African Americans, immunized them from the employees' disparate-impact suit challenging the administration of the written test as discriminatory. *Id.*

The Court held that a "bottom-line" result demonstrating an appropriate racial balance "does not preclude respondent employees from establishing a prima facie case, nor does it provide petitioner employer with a defense to such a case." *Id.* at 442. Title VII guarantees African Americans "the *opportunity* to compete equally with white workers on the basis of job-related criteria." *Id.* at 451 (emphasis in original). The written test acted as a barrier that disparately impacted the African American candidates who, because of failing the exam, were deprived of the opportunity to compete equally. *See id.* at 448–49.

Furthermore, the Court reasoned that "Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Id.* at 455.

The factual record reveals material differences between *Teal* and Alexander's case. *Teal* does nothing to obviate Alexander's duty to establish a causal connection between the defendants' TSPs and a discriminatory outcome for African American applicants. *See Inclusive Cmtys.*, 135 S. Ct. at 2523 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."). Alexander cannot establish this causal connection because there are no statistical disparities between the races of the public housing applicants and residents.[5] In *Teal*, the employees provided statistics that showed how African American candidates failed the written examination at a higher rate than white candidates. No such evidence exists in this case. Alexander provided evidence of general population statistics that show disproportionately higher criminal conviction rates for African Americans in the D.C. metropolitan area, but he failed to provide evidence of an actual discriminatory impact on African American applicants.

Furthermore, the "bottom-line" results in *Teal* that signaled favorable outcomes for some African American candidates could have only existed because of the employer's affirmative-action program on the back end of the promotion process. There is no evidence

---

[5] Alexander attempts to poke holes in the defendants' demographic calculations of applicants and residents. Pl.'s Resp. CGS Summ. Undisputed Facts ¶ 4, ECF No. 86-2; Pl.'s Resp. Edgewood Statement Material Facts ¶¶ 5, 7, 9, ECF No. 86-1. Even if those calculations did not exactly reflect reality, Alexander still bears the burden of proving an actual statistical disparity between applicants and residents, which he has not done.

that either of the defendants employed a remedial measure to artificially create an appropriate racial balance of residents. For example, suppose 98% of applicants to The Overlook and The View were African American and that the Edgewood defendants employed a remedial measure to offset an actual discriminatory impact of allegedly unlawful criminal background checks so that African Americans would make up 98% of its resident population. Only then would *Teal* be a suitable comparison. In the absence of such a remedial measure, Alexander was required to present evidence that the defendants' TSPs "select[ed] applicants . . . in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co.*, 422 U.S. at 425. Alexander failed to do so.

Although reliance on *Teal*'s reasoning was sufficient to withstand the defendants' motions to dismiss, Alexander has not presented enough evidence of disparate impact to advance his claims past summary judgment. Accordingly, Alexander has failed to establish that the defendants' TSPs had a disparate impact on actual African American applicants.

*B. Disparate Impact on Potential Applicants*

Alexander also argues that the disparate-impact analysis should extend to all potential African American public housing applicants from the D.C. metropolitan area, not solely to those who applied. He finds support for this argument in *Dothard v. Rawlinson*, 433 U.S. 321 (1977). The *Dothard* Court permitted the consideration of evidence of disparate impact based on general population statistics. *See* 433 U.S. at 330 ("There is no requirement, however, that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants."). An examination of actual applicants alone did not account for potential applicants who could determine for

11

themselves that they did not qualify for the position and decide not to even apply. *See id.* ("A potential applicant could easily determine her height and weight and conclude that to make an application would be futile.").

Alexander alleges that the defendants' TSPs could have caused otherwise qualified African Americans with criminal records in the D.C. metropolitan area to screen themselves from the public housing application pool. One issue with this argument is that Alexander has not provided any evidence to even suggest that such self-screening occurred.[6] Alexander points to no evidence suggesting that the D.C. metropolitan area African American population is even interested in applying to public housing, let alone screening themselves from the application pool.

Additionally, falling under a certain income level and passing a criminal background check do not by themselves automatically confer eligibility for public housing. The defendants evaluated other criteria when deciding whether to offer public housing to an applicant. For example, the defendants' TSPs from 2014 contain other requirements for residency eligibility related to credit history, prior rental history, alcohol and/or substance abuse history, immigration status, sex-offender status, and family size. *See* Edgewood

---

[6] After his denials of residency, Alexander states that "he lost hope and assumed other apartments would reject him." Pl.'s Opp'n Defs.' Mots. Summ. J. 26. Such anecdotal evidence provides little probative value in support of his claim that potential African American applicants from the D.C. metropolitan area screened themselves from the application pool. *See Stewart v. White*, 61 F. Supp. 3d 118, 130 (D.D.C. 2014) ("[A] plaintiff simply cannot survive summary judgment on such speculative, conclusory, and self-serving statements.") (citing *Greene*, 164 F.3d at 675).

Mot. Summ. J. at Exs. G-1, G-2, ECF Nos. 79-13, 79-14; Capitol Gateway Mot. Summ. J. at Ex. 2, ECF No. 80-4. Alexander's experts' statistics do not capture these criteria.[7]

The D.C. Circuit recently addressed a similar summary judgment issue in *Davis v. District of Columbia*. The plaintiffs accused the District of Columbia of creating a "race-based statistical disparity" by requiring applicants for Family Support Worker positions to have a bachelor's degree. *Davis*, 2019 U.S. App. LEXIS, at *30. In support of their disparate-impact claim, they provided "census data showing general racial disparities among degree holders in the District of Columbia." *Id.* at *31. The court reasoned that the plaintiffs would need to at least "identify the qualified applicant pool" to make a showing of "an adverse racial impact attributable to imposition of the challenged degree requirement." *Id.* The evidence of general racial disparities, the court noted, "could not by its own terms fill the gap in [the] record." *Id.* Without "evidence that these jobs are positions for which all District of Columbia resident applicants would necessarily be qualified," the evidence of general racial disparities "failed to make the relevant showing." *Id.* As such, the plaintiffs did not satisfy their burden to establish the existence of a racial disparity.

Even though Alexander rightly notes that a statistical showing of disparate impact need not be based on the characteristics of actual applicants, his case suffers from the same defect that the D.C. Circuit noted in *Davis*: Alexander did not identify the qualified

---

[7] Drs. Christopher Wildeman and Allan Parnell conducted extensive research related to the criminal history, income, and age characteristics of African Americans residing in the D.C. metropolitan area, and their research strongly suggests that African Americans of all age brackets from the D.C. metropolitan area are convicted of crimes at a disproportionately high rate compared to the area's white residents. *See generally* Decl. of Christopher Wildeman; Decl. of Allan Parnell.

applicant pool, which is fatal to a statistical disparity claim. Alexander's general population statistics of the D.C. metropolitan area are too broad and speculative, and thus are insufficient to advance his disparate-impact claims with respect to potential African American applicants past summary judgment.

Because Alexander fails to establish a prima facie case of disparate impact and does not raise any triable issues of material fact, this Court need not discuss whether the defendants' criminal screening policies would fall under the necessity exception or if there are less restrictive means of achieving a valid interest.

### C. Alexander's Permanent Injunction Claim

Injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*, 539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978). A plaintiff seeking a permanent injunction must demonstrate that: (1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because "the basis of injunctive relief in the federal courts has always been irreparable harm," courts need not consider the latter three factors where the plaintiff fails

14

to establish the first. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotations and citations omitted).

Alexander cites authority affirming that the "primary purpose of an injunction in Fair Housing Act cases is to prevent future violations of the Act and to eliminate any possible recurrence of a discriminatory housing practice." *United States v. Warwick Mobile Homes Estates, Inc.*, 558 F.2d 194, 197 (4th Cir. 1997). In order for there to be a "possible *recurrence* of a discriminatory housing practice," Alexander would need to prove that the defendants' policies violated the FHA in the first place. *Id.* (emphasis added). Alexander failed to do so and thus cannot attribute any irreparable harm to the defendants' alleged FHA violations.[8] As such, Alexander is not entitled to injunctive relief.

*D. Punitive Damages*

Punitive damages are "aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008). In general, punitive damages are appropriate when a defendant acts with evil motive or reckless indifference to the rights of others. *Smith v. Wade*, 461 U.S. 30, 48 (1983). "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

---

[8] This court need not address the issue of mootness (i.e. whether the defendants' new TSPs comply with more recent housing regulations) because Alexander failed to prove FHA violations in the first place.

Alexander is not entitled to compensatory damages because the defendants are not culpable for any of the alleged offenses, let alone an offense that is so reprehensible that it warrants even greater punishment, such as punitive damages. Furthermore, there is no harmful conduct to deter in this case because Alexander failed to establish a prima facie case of disparate impact. Accordingly, Alexander is not entitled to punitive damages either.

## IV. Conclusion

Because Alexander failed to establish a prima facie case of disparate impact, this Court will grant the defendants' summary judgment motions. A separate order follows.

Date: June 25, 2019

Royce C. Lamberth
United States District Judge

16